# Wytheville.

## RICHLANDS OIL COMPANY v. MORRISS.

June 11, 1908.

Absent, Whittle, J.

1. LEASES—*Options*—*Oil Leases.*—A contract by which a party, for a nominal consideration, acquires the exclusive right within a given time to enter upon the lands of another and drill for oil or gas, and, if found in paying quantities, to pay a stipulated price, vests no present estate in the land until the oil or gas is found. It confers merely the right of exploration; the title to the land remaining inchoate and contingent on the finding of oil or gas in paying quantities under the exploration provided for.

2. PROMOTERS—*Relation to Corporation.*—A promoter is a person who brings about the incorporation and organization of a corporation. He brings together the persons who become interested in the enterprise, aids in procuring subscriptions, and sets in motion the machinery which leads to the formation of the corporation itself. He occupies a fiduciary relation to the corporation. He is an agent of the corporation and subject to the disabilities of such.

3. CORPORATIONS—*Promoters*—*Disclosure of Facts*—*Rights of Subsequent Subscribers.*—Persons who have obtained, for a nominal consideration, oil leases which merely give the right to prospect and drill for oil, and who thereafter organize a corporation to take over said leases are promoters of the corporation, and occupy a fiduciary relation towards it. It they possess themselves of the corporation by making themselves its officers and directors, and, in the name of the corporation, purchase of themselves certain leases, and issue to themselves a large proportion of the stock of the company as a consideration for said leases, and then, without informing the public of the true condition of affairs, sell the remaining stock to the public, this is in fraud of the rights of such purchasers, and, upon a bill filed by them for the purpose, the promoter's stock should be cancelled. A full disclosure should have been made of all the facts to those purchasing the stock in good faith. Persons who, with knowledge of the facts, participate in the fraud are also liable.

Appeal from a decree of the Circuit Court of the city of Norfolk.  Decree for defendants.  Complainant appeals.

*Reversed.*

The opinion states the case.

*A. C. Braxton* and *J. M. Perry,* for the appellant.

*T. S. Purdie* and *Jeffries & Lawless,* for the appellee.

KEITH, P., delivered the opinion of the court.

The facts necessary to an understanding of this controversy are as follows:

Dabney and Webb had obtained leases upon certain lands in Kentucky, which gave them the privilege of prospecting for oil and gas.  The consideration stated in these leases is "one dollar in hand paid;" and they thereby acquired the exclusive right to enter upon the leased lands to drill for oil, gas or water, and to erect, maintain and remove all structures, pipe lines and machinery necessary for the production and storage of oil, gas or water; and it was provided that if oil should be found in paying quantities upon the premises, the lessee should deliver to the lessor in the pipe line with which its wells may connect one-eighth part of all the oil produced and saved from the premises; that if gas only were found, the lessee agreed to pay fifty dollars each year for the product of each well while the same was being operated; and that if no wells were commenced within twelve months from the date of the lease, the grant should become null and void, unless the lessee then paid to the lessor for the land ten cents per acre for each year.

Such a lease, it seems, vests no present estate in the land until the oil is found.  It confers merely the right of exploration, the title to the land remaining inchoate and contingent on the finding of oil or gas in paying quantities under the ex-

ploration provided for in such lease. *Steelsmith* v. *Gartlan,* 45 W. Va. 27, 29 S. E. 978, 44 L. R. A. 107, and authorities there cited.

Dabney and Webb associated with themselves in the ownership of these leases or options Jones and Oliver, of Bluefield, W. Va., they agreeing to pay $1,200 for the privilege of being taken into the scheme.

It was determined to organize a company with a capital stock of $1,000,000, divided into shares of the par value of $1.00 each, and to turn into the company these leases or options at the price of 600,000 shares of the capital stock, of which Jones and Oliver were to receive 300,000, and the latter were to sell enough of the stock to place $12,000 in the treasury of the company for purposes of development.

Before the charter of the company was obtained, S. E. Morriss was associated with the four already named, he having entered into a contract with E. E. Jones, which recites that in consideration of $1.00 in hand paid by said Morriss and the further consideration of the use of his name as a director in the Richlands Oil Company, to be organized and incorporated under the laws of South Dakota, the party of the first part, H. C. Jones, binds himself to deliver to Morriss 2,000 shares of the fully paid up and non-assessable stock of the Richlands Oil Company, to be subscribed for in the name of Jones and transferred to Morriss free of any other cost to said Morriss further than the use of his name as a director in the proposed company. It was further agreed that Jones would use his influence with the directors of the company to have Morriss' railroad fare paid while attending all directors' meetings; and it was further agreed by Jones, party of the first part, that the Richlands Oil Company to be organized and incorporated owned certain lands and leases in the State of Kentucky, and that Morriss should have the privilege of looking into, and investigating the title and prospective value of these holdings, and after he had so inspected them and satisfied himself as to

their commercial value, he should have the option of purchasing 25,000 shares of the stock at the price of two cents per share at any time he might elect, on or before the 23rd day of June, 1902, which should be subscribed for by said Jones and transferred to said Morriss, or to such other parties as Morriss might designate.

It will be noted that these various agreements as to the distribution of the stock were made before a charter was obtained, so that when, on the 2nd day of April, 1902, a certificate of incorporation was granted by the State of South Dakota on the application of S. E. Morriss, H. C. Jones, and T. P. Estes, a citizen of that State, 600,000 shares of the capital stock of the company had been parceled out between Dabney, Webb, Jones, Oliver and Morriss, and the remaining 400,000 shares were held by the company for sale to the general public.

Morriss, Jones, Webb and Dabney were named as four of the seven directors provided for in the charter. A fifth director was a man named White; and Estes, of South Dakota, was a sixth director.

On the 10th of April, 1902, the four promoters, who were directors in the company, held a meeting at Barbourville, Ky., within the oil district. The books of the company were opened for subscriptions to its stock, and Morriss, Dabney, Webb and Jones, being a quorum of the directors named in the charter, each subscribed for 100 shares, and at the same meeting 300 shares were subscribed for by others. Upon the adjournment of the meeting, Morriss, Dabney, Webb and Jones proceeded to the election of officers, when Jones was made president; Dabney, first vice-president; two citizens of South Dakota, second and° third vice-presidents; Morriss, secretary; and White, treasurer. They then purchased for the company the leases, fifty-two in number, for which they paid in accordance with an agreement entered into among themselves before the organization of the company, 600,000 of the 1,000,000 of the company's capital stock, of the par value of $1 per share.

These leases had cost $1 apiece, or $52 in the aggregate. The remaining 400,000 shares of the stock were placed in the treasury to be sold to the public at prices then fixed.

A few days thereafter another directors' meeting was held by the same directors—Morriss, Dabney, Webb and Jones—none others being present, at which they bought a lease of land upon which there was good prospect of finding oil, at the price of $6,000 in money and 50,000 shares of the treasury stock, of the par value of $50,000. A well was drilled upon the lease last purchased which produced oil; and from April, 1902, until the fall of that year, nearly 200,000 shares of the treasury stock were sold to the public at prices ranging from ten cents to forty cents per share before it was withdrawn from the market. During all this time the officers and directors first elected retained control of the corporation, and among other acts organized themselves into a committee to obtain agents to sell the company's stock; and Morriss, who was one of the committee, appointed himself an agent, and the commissions upon sales made by him amounted to about $4,900.

In the fall of 1904, after previous unsuccessful attempts to that end, the control of the company passed out of the hands of the original promoters, and an investigation was made which resulted in the cancellation of a large amount of promoters' stock, which was considered to have been fraudulently issued, and in the institution of this suit, having for its principal object the procuring of a decree to declare all of the promoters' stock, except such as had passed into the hands of *bona fide* holders for value, to have been fraudulently issued, and that it be canceled and annulled, and its holders be required to account to the company for all promoters' stock sold by them to *bona fide* purchasers for value, and now constituting a valid part of the company's capital stock; that the defendants be required to account for and jointly and severally pay to the company the profit made by Dabney or the promoters upon the sale of the Hammond lease to the Richlands Oil Company (the purchase

price of this lease, it will be remembered, was $6,000 in cash and 50,000 shares of the treasury stock) ; and that the defendants, jointly and severally, be held liable for and required to pay into court all sums received by the promoters on account of subscriptions to the capital stock of the company, and especially the sum of $4,900 paid on that account to S. E. Morriss.

Process to answer this suit was served upon S. E. Morriss and H. N. White. The other parties defendant could not be found. H. N. White came to an agreement with the Richlands Oil Co., and the suit as to him has been dismissed. It was heard as to S. E. Morriss alone, and a decree entered denying the relief prayed for against him; and from that decree an appeal was allowed by one of the judges of this court.

The record in this case is voluminous, and in it many minor facts appear which we have not deemed material to the issue presented, and have not for that reason mentioned.

We think it clearly appears that Dabney, Webb, Jones, Morriss and Oliver acquired the control of certain oil leases, which gave them the right to prospect and drill for oil upon certain lands in Kentucky, for which they paid an aggregate of $52, and then proceeded to transfer these leases to a company which they organized upon a capitalization of 1,000,000 shares, and distributed 600,000 of those shares among themselves; and having perfected the organization of the company by making themselves the president, secretary, treasurer, and directors, undertook to market the residue of the shares of stock, amounting to 400,000 shares, without informing the public as to the true condition of affairs. Dabney, Webb, Jones and Oliver, who hatched this scheme and acquired the leases upon which the organization of the corporation rested, were plainly promoters in the strictest sense of the term, and Morriss, who came into the arrangement before the charter was applied for, received 2,000 shares of paid-up and non-assessable stock from Jones as a bonus for the use of his name as director, and an option upon 25,000 shares for a given time at two cents

a share, is in no better position. He was an active agent, participating in the transaction from its inception. The stock which he received from Jones came into his hands under circumstances which not only do not sustain his claim to be a holder for value and without notice, but which repel any such pretension, and leave no room for doubt that he was informed as to the source from which Jones derived his title to the stock; so that it stands in the hands of Morriss, just as it stood in the hands of Jones, as promoters' stock, pure and simple, no more and no less.

In Cook on Corporations (4th ed.) sec. 651, it is said: "A promoter is a person who brings about the incorporation and organization of a corporation. He brings together the persons who become interested in the enterprise, aids in procuring subscriptions, and sets in motion the machinery which leads to the formation of the corporation itself. A person who procures subscriptions and aids in organizing the company and frames the papers and manages the procuring of options and the vesting of title is a promoter, even though he is also a subscriber.

"It is legal for persons to contract to form a corporation and to provide for its future management and control. But it is not legal for promoters to cause the board of directors to vote stock to such promoters for services already performed, nor is it legal for him to make his profit indirectly, by contracts between the corporation and others. A promoter is considered in law as occupying a fiduciary relation towards the corporation. He is an agent of the corporation, and is subject to the disabilities of such. There are two classes of cases in which he may be guilty of a breach of his duties to the company.

"First, where he sells property to the corporation. If he purchased the property before he began promoting the company, he may sell to the company at an advance without disclosing his profit. But where the promoter obtains merely an option on property, and then causes a company to be formed to which he sells it at a profit, without disclosing the amount of

that profit, he is liable in damages to subscribers for the stock."
*Bosher, et als.* v. *R. & H. Land Co., et als.* 89 Va. 455, 16 S. E.
360, 37 Am. St. Rep. 879.

Here, we have seen in the statement of facts that leases or
options were obtained, which did not carry with them any right
of property, but merely the privilege of going upon the land to
explore for oil.  We find these leases or options made the basis
for the organization of a company capitalized at a million shares
of a par value of one dollar each.  We find six hundred thou-
sand of these shares distributed among Webb, Dabney, Jones
and Oliver.  We have seen that the cost of the fifty-two options
or leases was the sum of fifty-two dollars.

With respect to Morriss, we have seen that he was to receive
from Jones two thousand shares of the paid-up and non-assess-
able stock for the use of his name as director; that he had the
privilege of purchasing from Jones twenty-five thousand shares
at two cents; and that by subsequent arrangements he ulti-
mately became the owner of more than one hundred thousand
shares of the capital stock.

Webb, Dabney, Jones and Oliver seem, in their relations to
the company, to have fulfilled every condition required by the
law to constitute them promoters of the company.  Morriss
says in his answer, that "In March, 1902, the defendant,
Jones, approached respondent with a proposition that respond-
ent should become one of the charter members of a company
which the defendants, Jones and Oliver, were forming for the
purpose of operating in the aforesaid oil fields.  The said Jones
represented to respondent, that the defendants, Dabney and
Webb, were both men of great experience in prospecting for
oil, and had made a thorough investigation of the Kentucky
fields, and considered them to be very promising; and had
secured leases on 52 distinct tracts of land, covering 10,032
acres; that they had agreed with the said Jones and Oliver
to turn these leases over to the proposed company and to take
in exchange therefor 600,000 shares of its stock.    *    *    *

Said Jones tendered respondent a contract dated March 27, 1902, a copy of which is filed herewith  *  *  *  " In his testimony, Morriss says, that he prepared that contract "in my own crude way;" and he further says in his deposition that he had never seen or heard of either Dabney or Webb until April 9, 1902; and yet his answer, from which we have just quoted, shows that he had heard of Dabney and Webb prior to the 9th of April, and had received through Jones full information with respect to the enterprise in which he was about to engage. Turning to the contract entered into between himself and Jones, we find that it is dated the 27th day of March, 1902, and that attached to it there is a list of the leases and options which the company to be formed was to take over and explore. While he says that he wrote that contract himself, it further appears that he was not without counsel, for he says that it was submitted to his attorney, the Hon. David E. Johnson, of Bluefield, by whom it was approved, and at whose suggestion, it seems, the list of options was appended to the contract. These leases or options Morriss says he carefully investigated. They were all taken during the fall of 1901, chiefly during the months of September and October; and they were all taken in the names of Webb and Dabney. So that, again his deposition is contradicted by written evidence. He certainly had heard of Webb and Dabney before the 9th of April, 1902.

He knew, then, of these leases. He knew that they were to be the basis upon which the company was to be organized; that they were mere licenses to explore, and did not confer a right of property in the lands described in them. When, therefore, he applied for a certificate of incorporation for the Richlands Oil Company on the 2nd of April, 1902, we cannot doubt that Morriss was informed of every important fact connected with the enterprise, and that he knew, when he became a stockholder and an officer in the company, that he was participating in an effort to sell to the public shares of stock in a company, the capital stock of which was to be 1,000,000 shares, 600,000

of which were by agreement to be distributed among promoters in exchange, not for property upon which oil wells had been opened, but for the mere right to prospect for oil, which privilege had cost the promoters in the aggregate $52.

Having no doubt that he was a promoter, the law is plain as to his duty. A full disclosure should have been made to the company and to those purchasing the treasury stock of the circumstances leading to the formation and organization of the company, the rights which they had acquired and the price which they were to pay, and especially the distribution which it had been agreed should be made of the capital stock. If the fact had been disclosed to those interested, that three-fifths of the capital stock had been distributed to promoters, for which there was nothing to show except a charter, and that those who purchased the treasury stock and thus furnished the resources by which property was to be acquired, explored and developed, by means of which the income of the corporation was to be earned; and that the owners of the treasury stock would have to pay three-fifths of the returns derived from the resources furnished by them to the holders of the stock which had been distributed among the promoters; such conduct would have been open and fair, would have satisfied the demands of the law, and left no ground for complaint to those who, with full knowledge, purchased shares in such an enterprise. But all this was carefully concealed. There was not a whisper to put purchasers of stock upon their guard; and when the facts came to the knowledge of the *bona fide* holders of the stock, and they finally acquired control of the company, they investigated and denounced the fraud, and adopted a resolution canceling all the shares of stock which had been issued in fraud of their rights.

Mention has been made in the statement of facts of the Hammond lease, upon which oil in paying quantities was discovered. It is claimed that this lease stands upon a different footing from the fifty-two leases of which we have heretofore spoken.

It is claimed that this lease was the property of Dabney, and that the company with full knowledge bought it of him, agreeing to pay $6,000 in cash and 50,000 shares of the treasury stock; and it is claimed upon behalf of Morriss that he advanced some of the money to the company with which this purchase was made, and that for the money so advanced he received shares of the treasury stock. The details of this transaction are obscure, and before passing upon it we think it safer that it should be the subject of further investigation.

So, too, with reference to the claims for commissions paid to Morriss, amounting to about $4,900. It seems that he was one of the committee to select agents for the sale of the company's stock; that as one of the committee he was to receive a commission for his services rendered in the appointment of agents; that the agent was to receive an additional commission for the sale of the stock; and that as a committeeman he appointed himself an agent, and received the commission in both capacities. It would seem at first blush that, if Morriss was a participant in a fraudulent scheme to foist shares of stock upon the public, he ought not to be allowed a commission upon such a transaction; but there is one circumstance which tends to show that in this phase of the transaction he was acting in good faith. He sold a number of shares of stock, at a price far in advance of what his own holdings had cost him. It is contended, and with much force, that he might have sold to the public his own stock rather than that belonging to the company, and have realized a considerable profit. In view of all these facts, and as the case has to go back upon another point, we shall leave this question open for further inquiry.

Upon the whole case, we are of opinion, that the decree should be reversed and the cause remanded to the circuit court, with instructions to enter a decree canceling all the so-called promoters' stock which now stands in the name of S. E. Morriss; and that with respect to the transactions growing out of

the Hammond lease, and the commissions received by Morriss upon the sale of stock, that the cause be referred to a commissioner with direction to report with respect to them.

The decree of the circuit court is reversed.

*Reversed.*