HENRY L. BERG AND ROSE BERG, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 7029.　Promulgated May 11, 1927.

Certain instruments herein construed and held to be oil and gas leases and not sales of capital assets within the meaning of section 206 of the Revenue Act of 1921.

*P. J. O'Connor, Esq.*, for the petitioners.
*J. E. Marshall, Esq.*, for the respondent.

This proceeding involves the determination of a deficiency in income tax for the year 1922, in the amount of $10,655.82. The only point at issue is whether the consideration received by Henry L. Berg for leasing certain oil and gas rights in certain lands falls within the classification of gain from the sale of capital assets as provided by section 206 of the Revenue Act of 1921. The facts are found as stipulated.

#### FINDINGS OF FACT.

Petitioners are husband and wife and are residents of Camden, Ark.

Henry L. Berg and his brother, Leo Berg, for nearly forty years prior to 1922, were in the mercantile business together at Camden. Throughout such period they acquired the fee simple title to ap-

proximately 40,000 acres of land in Calhoun and Ouchita Counties, Arkansas. By deed dated May 16, 1922, and duly executed by Henry L. Berg and his brother, Leo Berg they conveyed to Rose Berg, wife of Henry L. Berg, a fee simple title to fractional interests in the said 40,000 acres of land. At sundry times in the year 1922 on or before November 18, 1922, Henry L. Berg and Rose Berg, his wife, together with Leo Berg and his wife and children, executed certain oil and gas leases to divers parties. All of the leases were in all respects similar and so far as is material here provided:

That the said lessor for and in consideration of ———— Dollars cash in hand paid, the receipt of which is hereby acknowledged, and of the covenants and agreements hereinafter contained on the part of the lessee to be paid, kept and performed, have granted, conveyed, demised, leased and let, and by these presents do grant, convey, demise, lease and let unto said lessee, for the sole and only purpose of mining and operating for oil and gas, and laying of pipe lines, and of building tanks, towers, stations and structures thereon to produce, save and take care of said products, and all that certain tract of land situated in the County of ———— State of ————.

It is agreed that this lease shall remain in force for a term of ———— from this date, and as long thereafter as oil or gas, or either of them is produced from said land by the lessee.

In consideration of the premises the said lessee covenants and agrees:

1st. To deliver to the credit of the lessor, free of costs in tanks or pipe line to which it may connect its wells, the equal one-eighth part of all oil produced and saved from the lease premises.

2nd. To pay the lessor ———— Dollars each year in advance, for the gas from each well where gas only is found, while the same is being used off the premises, and lessor to have gas free of cost from any such well for all stoves and all inside lights in the principal dwelling houses on said land during the same time by making his own connection with the well at his own risk and expense.

3rd. To pay lessor for gas produced from any oil well used off the premises at the rate of ———— Dollars per year, for the time during which such gas shall be used, such payments to be made each three months in advance.

If no well be commenced on said land on or before the ———— day of ————, 19—, this lease shall terminate as to both parties, unless the lessee, on or before that date, shall pay or tender to the lessor, or to the lessor's credit in the ———— Bank of ————, Arkansas, or its successors, which shall continue as the depository regardless of changes in the ownership of said land, the sum of ———— which shall operate as a rental and cover the privileges of deferring the commencement of a well for ———— from said date. In like manner and upon like payments or tenders the commencement of a well may be further deferred for like periods in the same number of months successively. And it is understood and agreed that the consideration first recited herein, the down payment, covers not only the privileges granted to the date when said first rental is payable as aforesaid, but also the lessee's option of extending that period as aforesaid, and any and all other rights conferred.

Should the first well drilled on the above described land be a dry hole, then, in that event, if a second well is not commenced on said land within twelve months from the expiration of the last rental period from which rental has been paid, this lease shall terminate as to both parties, unless the lessee on or before the expiration of said twelve months shall resume the payment of rentals in the same amount and in the same manner as herein-

after provided. And it is agreed that upon the resumption of the payment of rentals, as above provided, that the last preceding paragraph hereof governing the payment of rentals and the effect thereof, shall continue in force just as though there had been no interruption in the rental payments.  *  *  *

For the calendar year 1922, the petitioners filed a joint return on March 14, 1923, showing the income of the wife separate and apart from the income of the husband. The only income reported for the wife represented profits of $35,134.14 from the leasing of the oil and gas rights in the land mentioned and described on the return as "capital net gain." The return also included like profits of $40,230.37 of the husband, described likewise on the return as "capital net gain;" and for the purpose of arriving at the tax liability of both individuals jointly, the income of the wife was added to the husband's income, making an aggregate reported joint net income of $78,458.83—on which amount a tax of $9,807.35 was computed by petitioners at 12½ per cent, on the theory that such computation was authorized by section 206 of the Revenue Act of 1921.

Upon an audit of the return, the Commissioner found the aggregate joint net income of petitioners to be $81,941.57, which net income is admitted by petitioners to be correct. The Commissioner in computing the tax did not consider the profits arising out of the leasing of the oil and gas·rights aforesaid as falling within the provisions of section 206 of the Revenue Act of 1921, but computed the tax under sections 210 and 211 of that Act; and he arrived at a deficiency in tax of $10,655.82 due by Henry L. Berg and Rose Berg. Of the admitted net income of $81,941.57, there was received by the petitioners from the leasing of the oil and gas rights on the property mentioned the sum of $78,844.24, divided between them as follows:

| | |
|---|---|
| Henry L. Berg | $42, 872. 12 |
| Rose Berg | 35, 972. 12 |

The income of $42,872.12 of Henry L. Berg arose out of the leasing of the aforementioned oil and gas rights on land in which he owned an undivided fee simple interest for more than two years prior to the execution of the said leases. The income of $35,972.12 of Rose Berg arose out of the leasing of the said oil and gas rights on land in which she owned an undivided fee simple interest for less than two years prior to the execution of the said leases.

OPINION.

LITTLETON: The tax in controversy is for the year 1922 and if the consideration received by the petitioners for leasing the said oil and gas rights falls within the classification of gain from the sale

of capital assets as provided by section 206 of the Revenue Act of 1921, the Commissioner's determination is erroneous, but if section 206 does not apply to the income received by petitioners from the oil and gas leases involved herein, the Commissioner's determination is correct.

The pertinent parts of section 206 of the Revenue Act of 1921, which petitioners insist apply and the Commissioner contends are not applicable to this case, are as follows:

SEC. 206. (a) That for the purpose of this title:

(1) The term "capital gain" means taxable gain from the sale or exchange of capital assets consummated after December 31, 1921;

\*       \*       \*       \*       \*       \*       \*

(6) The term "capital assets" as used in this section means property acquired and held by the taxpayer for profit or investment for more than two years (whether or not connected with his trade or business), but does not include property held for the personal use or consumption of the taxpayer or his family, or stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year.

(b) In the case of any taxpayer (other than a corporation) who for any taxable year derives a capital net gain, there shall (at the election of the taxpayer) be levied, collected and paid, in lieu of the taxes imposed by sections 210 and 211 of this title, a tax determined as follows:

A partial tax shall first be computed upon the basis of the ordinary net income at the rates and in the manner provided in sections 210 and 211, and the total tax shall be this amount plus 12½ per centum of the capital net gain; but if the taxpayer elects to be taxed under this section the total tax shall in no such case be less than 12½ per centum of the total net income. The total tax thus determined shall be computed, collected and paid in the same manner, at the same time and subject to the same provisions of law, including penalties, as other taxes under this title.

The Committee on Ways and Means said at page 10 of its report:

The sale of farms, mineral properties, and other capital assets is now seriously retarded by the fact that gains and profits earned over a series of years are under the present law taxed as a lump sum (and the amount of surtax greatly enhanced thereby) in the year in which the profit is realized. Many such sales, with their possible profit taking and consequent increase of the tax revenue, have been blocked by this feature of the present law. In order to permit such transactions to go forward without fear of a prohibitive tax, the proposed bill, in section 206, adds a new section (207) to the income tax, providing that where the net gain derived from the sale or other disposition of capital assets would, under the ordinary procedure, be subjected to an income tax in excess of 15 per cent, the tax upon capital net gain shall be limited to that rate. It is believed that the passage of this provision would materially increase the revenue, not only because it would stimulate profit-taking transactions but because the limitation of 15 per cent is also applied to capital losses. Under present conditions there are likely to be more losses than gains.

The question, therefore, is whether the execution of such oil and gas leases as the one herein is a "sale" or "exchange" of a capital asset, as defined by the section quoted.

Whether or not such leases constitute a sale of the oil and gas in place has been variously held by different courts, there being much conflict of authority, though, in our opinion, the greater weight of authority is to the effect that such oil and gas leases are not outright sales of oil and gas in place, but merely grants to such lessees of the right or privilege to go upon the land, drill for oil and gas and remove it when found.

In *Appeal of Nelson Land & Oil Co.*, 3 B. T. A. 315, the Board held that certain instruments, somewhat similar to the leases now under consideration, were oil and gas leases and not conveyances of oil and gas in place and that amounts paid to the grantor of oil and gas leases as a bonus constituted additional royalties and not a return of capital.

In *Rich* v. *Doneghey*, 71 Okla. 204; 177 Pac. 86, referring to oil and gas leases, the court said:

The right so granted or reserved, and held separate and apart from the possession of the land itself, is an incorporeal hereditament; or more specifically, as designated in the ancient French, a profit *à prendre*, analogous to a profit to hunt and fish on the land of another.

In *Walla Walla Oil, Gas & Pipe Line Co.* v. *Vallentine*, 103 Wash. 359; 174 Pac. 980, the court states:

*The contract amounts only to a license entitling the licensee to search and dig for oil and gas according to the terms of the grant*, and appropriate the produce to his own use on payment of the royalty or proportion without acquiring any property in the minerals until they are severed from the land. They create only an incorporeal hereditament—a right issuing out of or concerning land. [Italics ours.]

Numerous authorities might be cited showing that leases similar to those involved in this proceeding are not sales of the oil and gas in place or in the land but are merely grants to the lessees of the right to go upon the land, drill for oil, and remove it when found. A few authorities only are here cited. *Brown* v. *Spilman*, 155 U. S. 665; *Osborn* v. *Arkansas Territorial Oil & Gas Co.*, 103 Ark. 175; 146 S. W. 122; *Kolachny* v. *Galbreath*, 26 Okla. 772; 110 Pac. 902; *Kelly* v. *Keys*, 213 Pa. 295; 62 Atl. 911; *Watford Oil & Gas Co.* v. *Shipman*, 233 Ill. 9; 84 N. E. 53; *Florence Oil & Refining Co.* v. *Orman*, 19 Colo. App. 79; 73 Pac. 628; *Pittsburgh & West Virginia Gas Co.* v. *Ankrom*, 83 W. Va. 81; 97 S. E. 593; *Richlands Oil Co.* v. *Morriss*, 108 Va. 288; 61 S. E. 762.

Under decisions of the Supreme Court of Texas, *Stephens County* v. *Mid-Kansas Oil & Gas Co.*, 113 Tex. 160; 254 S. W. 290, and a few other States such leases are held to be sales of the ore or oil in place.

We think it unnecessary in order to dispose of the issue here presented to decide whether there is ownership of oil and gas in place.

By the instrument in question the petitioner " leased and let unto the lessee, for the sole and only purpose of mining and operating for oil and gas  *  *  *  and to deliver to the credit of the lessor, free of costs,  *  *  *  the equal of one-eighth of all oil produced and saved from the leased premises " and to pay the lessor certain sums where only gas is found. This language does not comport with the term " sale " as that term appears to have been used in section 206. The proceeds of minerals, and by minerals we include oil and gas, obtained from mining operations constitute gross income to the owner of the leased premises, and this is true where the minerals are leased. The result of an ordinary mining lease, such as we have here, is merely to transfer the cost of operations from the owner to the lessee. The operation remains the same and the proceeds of the operation are divided between the lessee and lessor, the portion of the minerals and amounts paid to the lessor pursuant to the lease usually being termed " royalty." Gross proceeds extracted in the usual course of mining operations have long been considered gross income. *Stratton's Independence* v. *Howbert*, 231 U. S. 399; *Stanton* v. *Baltic Mining Co.*, 240 U. S. 103; *Von Baumbach* v. *Sargent Land Co.*, 242 U. S. 503; *United States* v. *Biwabik Mining Co.*, 247 U. S. 116.

In *Von Baumbach* v. *Sargent Land Co.*, supra, the court said:

The nature of these mining leases has been the subject of some difference of opinion in the courts. The Circuit Court of Appeals in this case took the view announced in some of the earlier cases, notably in Pennsylvania, that the leases were such in name only, and were in fact conveyances of the ore in place as part of the realty, and that the so-called royalties merely represented payments for so much of the land and were in no just sense income, but mere conversions of the capital.

The court then referred to certain decisions of the Supreme Court of Minnesota to the effect that mine leases were in fact leases and the compensations paid thereunder were rent. The court continued:

These conclusions of the Supreme Court of Minnesota are not only made concerning contracts in that State, such as are here involved, but are supported by many authorities. Ordinarily, and as between private parties, there is no question of the duty of the federal court to follow these decisions of the Minnesota Supreme Court, as a rule of real property long established by state decisions. *Kuhn* v. *Fairmont Coal Company*, 215 U. S. 349, 360. Whether in considering this Federal statute we should be constrained to follow the established law of the State, as is contended by the Government, we do not need to determine. The decisive question in this case is whether the payments made as so-called royalties amount to income so as to bring such payments within the scope of the Corporation Tax Act of 1909. The prior decisions of this court in *Stratton's Independence* v. *Howbert*, 231 U. S. 399, and *Stanton* v. *Baltic Mining Company*, 240 U. S. 103, in which the *Stratton Case* was followed and approved, are decisive of this question.

The court further said:

We think that the payments made by the lessees to the corporations now before the court were not in substance the proceeds of an outright sale of a mining property, but, in view of the terms of these instruments, were in fact rents or royalties to be paid upon entering into the premises and discovering, developing and removing the mineral resources thereof, and as such must be held now as then, to come fairly within the term income as intended to be reached and taxed under the terms of the Corporation Tax Act.

In *United States* v. *Biwabik Mining Co., supra*, the court said:

The lessee takes from the property the ore mined, paying for the privilege so much per ton for each ton removed. He has this right or privilege under the form of lease here involved so long as he sees fit to hold the same without exercising the privilege of cancellation therein contained. He is, as we held in the *Sargent Land Company Case*, in no legal sense a purchaser of the ore in place.

Section 206 of the Revenue Act of 1921 provides for a method of taxing the " gain from the sale or exchange of capital assets." This provision of itself, and especially when taken in connection with the Report of the Ways and Means Committee, shows that the tax therein proposed is a tax upon gains from a sale, the basis of which gain is the difference between the cost or March 1, 1913, value and the selling price. See *United States* v. *Flannery*, 268 U. S. 98. Upon the other hand, the gross proceeds of minerals extracted in mining operations have been considered gross income without reference to cost since 1913 and all of the Revenue Acts passed since that time and the decisions of the courts have been upon this basis. It thus appears that this theory is one embodied in the Revenue Acts and exists irrespective of what the laws of various States may be relative to mining. This case presents a question similar to that presented in the *Burk-Waggoner Oil Association* v. *Hopkins*, 269 U. S. 110, wherein it was said:

The claim that the Act, if so construed, violates the Constitution is also unsound. It is true that Congress cannot make a thing income which is not so in fact. But the thing to which the tax was here applied is confessedly income earned in the name of the Association. It is true that Congress cannot convert into a corporation an organization which by the law of its State is deemed to be a partnership. But nothing in the Constitution precludes Congress from taxing as a corporation an association which, although unincorporated, transacts its business as if it were incorporated. The power of Congress so to tax associations is not affected by the fact that, under the law of a particular State, the association cannot hold title to property, or that its shareholders are individually liable for the association's debts, or that it is not recognized as a legal entity. Neither the conception of unincorporated associations prevailing under the local law, nor the relation under that law of the association to its shareholders, nor their relation to each other and to outsiders, is of legal significance as bearing upon the power of Congress to determine how and at what rate the income of the joint enterprise shall be taxed.

In *Lynch* v. *Alworth-Stephens Co.*, 267 U. S. 364, the court, after referring to *Von Baumbach* v. *Sargent Land Co.* and *United States* v. *Biwabik Mining Co.*, said:

It was held in both cases, as we hold here, that the leases under consideration did not convey title to the ore in place.

In the Revenue Act of 1921 we find in section 214 (a) (10) referring solely to mines, oil and gas wells, the word "leases." This word must mean leases as construed by the courts and as taxed under previous acts. It must include all mining leases which resemble the ordinary form of mining lease, and all such leases are to be given effect for taxing purposes as theretofore construed by the courts.

The decision of the Board in the *Appeal of Anna Taylor*, 3 B. T. A. 1201, is relied on by petitioner in support of his contention that amounts received under the lease here involved were gains from the sale of capital assets. That case involved the outright sale of a lease and has no application to the question here involved.

For the reasons hereinbefore given, the Board is of the opinion that amounts received under the terms of the lease here involved were not a "gain from the sale or exchange of capital assets" within the meaning of section 206 of the Revenue Act of 1921, and the determination of the Commissioner is accordingly affirmed.

*Judgment will be entered for the respondent.*