Staunton.

## BURNEAGLE COAL AND COKE CORPORATION v. W. P. HENRITZE, ET ALS.

September 18, 1924.

1. PROMOTERS—*Fiduciary Relationship—Secret Profits.*—Promoters of corporations occupy a fiduciary relation to stockholders whom they induce to subscribe to stock, and they are held to strict accountability for all secret profits. But it should be borne in mind that in many cases, the liability of promoters for secret profits rests not so much upon the absence of knowledge on the part of the subscribers for stock as upon the lack of legal proof of such knowledge in the hands of the promoters.

2. PROMOTERS—*Whether Party a Promoter or Independent Vendor—Case at Bar.*—In the instant case an action against promoters of a coal corporation for fraud in the organization and promotion of the company, the chief controversy arose as to the responsibility of one of the defendants. That is to say whether he was liable as promoter or as an independent vendor to his codefendants and the company and in no degree responsible for any dereliction or omission on the part of his codefendants, the promoters.

   *Held:* That there was nothing in the record which would justify a court in discrediting the evidence which demonstrated the fact that this defendant was an independent vendor and the other defendants independent vendees of the property; and that although there were inconsistencies in the testimony they were not sufficient to suggest either perjury or fraud.

3. CONTRACTS—*Interpretation and Construction—All the Language to be Considered.*—In the interpretation of a contract, all of the language of the contract must be considered for equity seeks to apprehend the substances rather than the shadow.

4. PROMOTERS—*Who are Promoters—Mere Designation of Party as Promoter.*—In determining the responsibility of a promoter, care must be observed to note that such responsibility depends upon his actions and his true relation to the company, and not upon the name by which he is called. The mere designation of a party to a contract as a promoter does not of itself bring him into a fiduciary relationship with and consequent fiduciary obligation to the corporation.

5. PROMOTERS—*Liability—Necessity of Determining that One is a Promoter.*—The question of fact as to whether or not one is a promoter must be first decided before the consequent legal obligations resting upon a fiduciary can be imposed upon him.

6. PROMOTERS—*Definition.*—While no satisfactory definition of a promoter which will apply under all circumstances has yet been made, the following definition was found helpful in the instant case. "A promoter is a person who brings about the incorporation and organization of a corporation. He brings together the persons who become interested in the enterprise, aids in procuring subscriptions, and sets in motion the machinery which leads to the formation of the corporation itself. A person who procures subscriptions and aids in organizing the company and frames the papers and manages the procuring of options and the vesting of title is a promoter."

7. PROMOTERS—*Who are Promoters—Independent Vendor—Case at Bar.*—In the instant case, an action against promoters of a coal corporation for fraud in the organization of the corporation, one of the defendants who had sold the property to the corporation and his other defendants and who positively declined to become an incorporator, officer or director, until long after he had been paid for the property in full, and who neither procured its charter, secured its capital, selected its directors, nor conducted its operations, was not a promoter. Notwithstanding the fact that he was called a promoter in the contract for the purchase of the property, until the purchase money so contracted for was paid to him, he clearly maintained the relation of a vendor and importunate creditor demanding payment of his debt.

8. PROMOTERS—*Secret Profits—Duty of Promoters to Spread Contracts on Records—Duty to Report to the Corporation Commission.*—While it is the duty of promoters to have contracts under which they were to receive compensation for their services spread upon the records of the corporation, and as promoters and officials of the corporation to report to the State Corporation Commission fully and frankly every fact and circumstance shown by these contracts, together with the disposition which was to be made of the funds collected, with the same detail as was shown in the contracts, yet for their dereliction in this respect an independent vendor from whom they and the corporation had purchased the property of the corporation was not responsible.

9. PROMOTERS—*Liability of Promoters—Knowledge of Stockholders.*—In a suit against promoters for fraud in the organization of the corporation, the stockholders were chargeable with all that the records of the company showed, of all that the statements of the company to the Corporation Commission disclosed, and also with the knowledge that the promoters expected in some way to be paid for their diligent and persistent efforts in organizing the corporation. While pro-

moters must be held to the strictest accountability, the determination of each case must generally depend upon its own peculiar facts.

10.   PROMOTERS—*Secret Profits—Liability of Promoters.*—Where promoters withheld from the stockholders the information that they were receiving common stock originally contracted to be paid to a vendor as part of the purchase price of the property of the corporation, the court properly, because of this dereliction, ordered them to return to the corporation for cancellation the stock thus received from the vendor, which constituted a source of contingent and possible profit to them as promoters not disclosed by them to the stockholders.

Appeal from a decree of the Law and Chancery Court of the city of Roanoke.   Decree for defendants.   Plaintiff appeals.

*Amended and affirmed.*

The opinion states the case.

*Hugh A. White, S. V. Kemp, H. T. Hall* and *Rudolph Bumgardner,* for the appellant.

*Jackson & Henson, Caldwell & Chaney, Woods, Chitwood, Coxe & Rogers* and *H. M. Fox,* for the appellees.

PRENTIS, J., delivered the opinion of the court.

This is a suit brought by the Burneagle Coal and Coke Corporation, at the instance of its stockholders, against W. P. Henritze, James E. Walker, H. E. Obenshain, C. S. McNulty and J. H. Matthews, alleging that because of conspiracy and fraud in the organization and promotion of the company the contract for the purchase of the property from Henritze should be annulled, the purchase money refunded, and that because of secret profits retained by Henritze, McNulty and Walker, the stock issued to them should be also cancelled, and for decree against them for all profits realized.

The decree is in favor of Henritze, confirms the sale, and exonerates him from all responsibility, but requires Walker and McNulty to restore for cancellation the common stock received by them pursuant to their contract, and awards costs against the company, evidently upon the ground that the defendants substantially prevail.

It is said by the learned counsel in the petition that "the record in this case is voluminous and contains a mass of irrelevant and immaterial documents and other evidence, but when this record is examined it will be seen that the facts necessary to a decision of the questions involved are comparatively few and simple and may be briefly stated." This implied promise to state briefly the facts relied on as necessary to a decision of the questions involved is hardly fulfilled, for the briefs of appellant's counsel cover 130 pages, while the opposing briefs cover 170 pages. Notwithstanding these discouragements, we shall thus aided attempt to extract from the record of 831 pages the pertinent and decisive facts. We shall omit much which is referred to, not because it does not constitute the basis for fair argument to establish or refuse contentions dependent upon circumstantial evidence, but because after giving the entire record due consideration it appears to us likewise that the determining facts are relatively few.

There is little, if any, difference between counsel as to the law, but the controversy arises out of the facts and the fair inferences to be drawn therefrom.

[1] That promoters of corporations occupy a fiduciary relation to stockholders whom they induce to subscribe to stock, and that they are held to strict accountability for all secret profits, is not questioned. In view of the evidence in this case, however, it is not inappropriate to quote some observations found in Ehrick

on Promoters, page 267, as they are fully verified by common experience.

"It is true that where the venture is a small one, the shareholders few, and the transaction resembles a partnership under corporate guise, the subscribers may well believe that the promoters are making no profit and seeking no compensation for their services.   In the case of large flotations it is generally a matter of common knowledge, or at least of necessary surmise, that the persons engaged in the promotion expect to receive, in return for their labor and risk, a liberal reward in the shape of substantial promoters' profits.  If the subscribers are not aware of the profits to be made by the promoters, it is generally because they do not trouble to inquire, or, feeling that their inquiries might not be well received, accept their shares upon the strength of the reputation of the promoters, and the success of their previous enterprises, being quite willing that the promoters should take such personal profits as they see fit. Objection is made only after the enterprise has proved unsuccessful, and the subscribers are anxious to find some means of shifting their losses to the promoters. The promoters are then called upon to make proof of a sufficient disclosure, and this may, even though the subscribers actually had ample knowledge, often be impossible.   It has been said that although it is the undoubted duty of the courts to relieve those deceived by false representations, their duty is equally clear to be careful that in their anxiety to correct fraud they do not enable persons who joined with others in speculations to convert their speculations into certainties at the expense of those with whom they joined.   The promoters certainly should not be permitted secretly to profit by the promotion, but one cannot but fear that the liability of the promoters rests in many cases, not so much upon

the absence of knowledge on the part of the subscribers, as upon the lack of legal proof in the hands of the promoters."

The chief controversy arises as to the responsibility of Henritze, the vendor, and the case against him depends upon whether or not he was a promoter or conspired with the promoters of the corporation to deceive and defraud those who subscribed to its stock.   For Henritze it is contended that he is in no degree responsible for any dereliction or omission on the part of his codefendants, but that he occupied the independent position of vendor to them and to the company, and sustained no fiduciary relation whatever to the stockholders.

The preliminary facts may be thus epitomized:  Prior to February 15, 1917, Henritze, being already fairly familiar with the property, conceived the idea of acquiring the stock of the Frid-Mullins Coal and Coke Corporation, which owned 2,370 acres of land in Logan and Mingo counties, West Virginia.   In January, 1917, he had actually acquired and paid for nearly one-half of the stock of that company, and shortly thereafter, before any of his codefendants knew of this, and before the scheme of organizing the Burneagle corporation was conceived, he had arranged through the First National Bank of Logan, West Virginia, for the purchase of the residue of the stock, had incurred expense and made plans for the development of the property.   Actual payment for this entire residue of the stock was accomplished March 31, 1917.

[2] On the other hand the appellants contend that all of this is untrue and that Henritze acquired this stock as a promoter of the company, and hence, before the purchase by him was completed, occupied a fiduciary relation to the future stockholders of the company. This contention, however, discredits and ignores all of

the testimony of those familiar with the transactions. It is sufficient for us to say, as it was sufficient for the trial judge to conclude, that there is nothing in the record which would justify a court in discrediting the evidence which demonstrates the fact that Henritze was unquestionably the owner of all of the stock of the Frid-Mullins company before his negotiations for the sale of it to the defendants as promoters of the Burneagle corporation began. There are some inconsistencies in the testimony of some of the parties to the transaction as to some of the important details, but not as to the controlling fact, that Henritze was the independent vendor and they the independent vendees of the property, and the inconsistencies are not sufficient to suggest either perjury or fraud. They are only such differences as would be naturally found in the testimony of credible witnesses closely cross-examined as to circumstances, dates, conversations and negotiations which occurred six or seven years prior to the time they testified.

Among the circumstances showing that Henritze was an independent vendor, dealing for himself alone with independent vendees, is the fact that McNulty, Walker and Obenshain, before concluding any contract, employed an experienced geologist and mining engineer to investigate and report to them as to the value of the property. This report was promptly made. It was most favorable, and indicated that it was rich in coal and timber, but this report was by them concealed from Henritze, the vendor, until May 8, 1917, long after their final contract of purchase had been executed, on April 16, 1917. There was a parol agreement made April 6th, and at the instance of McNulty the vendor drew a draft for $25,000.00 upon Walker and McNulty, but when presented Walker denied any obligation to pay it, and the vendor considered the negotiations ended.

They were promptly resumed, however, and on April
16, 1917, a new and different contract dated April 6,
1917, was entered into, and the $25,000.00 draft was
thereafter paid by Walker and McNulty.   It is out of
this consummated contract that this controversy grows.
It is printed in the margin.*

[3] It is observed that in this contract Henritze is
spoken of as a promoter.   A fair analysis of it shows
also that Henritze, who then owned all of the stock of

*This memorandum of agreement, made and entered into this 6th day of
April, 1917, between W. P. Henritze, The Frid-Mullins Coal and Coke Com-
pany, Inc., by W. P. Henritze, who owns and controls its entire capital stock,
James E. Walker and H. E. Obenshain and C. S. McNulty.
.   "Witnesseth as follows:
"That the said parties, in accordance with the terms and agreements
hereinafter set forth, propose to organize a stock company to take over the
holdings of the Frid-Mullins Coal and Coke Company, Inc., which is the
owner of 2,370 acres of land, more or less, this being taken in gross and not
by the acre, in the counties of Mingo and Logan, West Virginia.   It being
understood and agreed that all parties to this agreement, will use all dili-
gence to promote the proposed corporation, so that the said property may
be paid for as speedily as possible.
"The said property, consisting of certain tracts of land owned by the
Frid-Mullins Coal and Coke Company, Inc., aggregating 2,370 acres, more
or less, is to be taken in gross, as a whole, without any additional survey on
our part, at a valuation of $237,500.00.   It being understood and agreed that
the said W. P. Henritze owns and controls all the stock of the Frid-Mullins
Coal and Coke Company, Inc., and that he can and will deliver the same to
a new corporation to be formed by the said James E. Walker, C. S. McNulty
and H. E. Obenshain.
"The said new corporation, the name of which is to be hereafter deter-
mined, shall issue stock as follows:   Preferred stock to bear seven per cent
cumulative dividends in the sum of $500,000.00, said stock to consist of 25,000
shares of the par value of $20.00 each.
"It being understood and agreed that the charter of the said proposed
corporation be immediately applied for, either in Virginia or West Virginia,
as we may deem best.
"It is further understood and agreed that the preferred stock be offered
for sale, the first 6,250 shares of the preferred stock to have offered with it
an equal amount of the common stock, and that the combination of pre-
ferred and common stock—one share of each—be offered to the public and
sold at a combination price of $25.00 for the share of preferred and the share
of common; that the second 6,250 shares of preferred stock have sold with it
3,125 shares of common stock, said shares of preferred and common to be
sold at $25.00 for one share of preferred and one-half share of common; the
next 12,500 shares of preferred are to be offered to the public, together with
3,125 shares of common stock, said shares to be sold to the public at the
combination price of $25.00 for one share of preferred and one-fourth of
one share of common.

the Frid-Mullins company is vendor; that he agrees to
sell the land to a corporation which is "to be formed by
the said James E. Walker, G. S. McNulty and H. E.
Obenshain;" that Henritze, as the vendor, is to receive
from the vendees $237,500.00 in cash, and 5,000 shares
of the common stock of the par value of $100,000.00.
It is here observed that while the contract does not spe-
cifically designate the 5,000 shares as a part of the pur-
chase price, Walker, McNulty and Obenshain all swear
that it was a part of the purchase price and was always
so understood.    The amended agreement of May 7th
emphasizes and clarifies this.    All of the language of the
contract must be considered, for equity seeks to appre-
hend the substance rather than the shadow.    When so

"The residue of the common stock, to-wit, 12,500 shares, shall be divided
as follows:  5,000 shares to W. P. Henritze, 7,500 shares to H. E. Obenshain.

"To sum up, therefore, it is hereby mutually agreed and understood that
there shall be issued in the proposed new corporation $500,000.00 of stock of
the par value of $20.00 per share, seven per cent cumulative preferred stock;
that there shall be issued $500,000.00 of stock at the par value of $20.00 per
share, common stock, making a total issue of $1,000,000.00.  $250,000.00 of
the said common stock shall be sold along with the $500,000.00 of preferred
stock, and $250,000.00 of the common stock shall go to the promoters and
organizers of the proposed corporation, as above set forth.

"It is further mutually agreed and understood that in order that the ex-
penses of the organization of the proposed corporation and that the sale of
the said stock shall be provided for, that $5.00 of the selling price of the pre-
ferred and common stock in the combinations as hereinabove set forth, shall
be set apart to bear all the expenses of the organization of said corpora-
tion, payment of all charter fees, employment of agents, office rent, and
other incidental expenses of the organization.

"It being understood and agreed that H. E. Obenshain, who shall have
full charge of the organization of the said corporation, and the selling of the
said stock, shall have, out of the said $5.00, $2.00 from the sale of every share
of preferred stock, together with the combinations, as above set forth, with
the common stock, and that of the said $2.00, the said Obenshain shall re-
tain eighty per cent for himself and his associates, and twenty per cent of
the said amounts derived from the $2.00 on the sale of the said stock, shall
go to W. P. Henritze.  It being further understood and agreed that $3.00
of the said $5.00 shall be paid to the agents, or to those parties, whoever
they may be, who are responsible for or bring about the sale of the said
stock in the combinations above set forth.  It being understood that all the
expenses of organization, as above set forth, shall be paid out of the fund
arising from the $2.00 coming to the said Obenshain and Henritze in pro-
portions of eighty per cent and twenty per cent, and the $3.00 being in-
tended as commissions to agents, or those selling the stock, only.

"It is further understood and agreed that the holders of the common
stock of the proposed corporation only, shall have voting power, provided,
however, that the preferred dividends are promptly and regularly paid.

considered it shows that so much of its phraseology as describes Henritze as promoter is inapt, inconsistent with its main purpose, and does not truly express either the status of the parties or the true agreement which is otherwise therein so clearly expressed. The contract provides that out of each $25.00 arising from the sale of each share of stock, $20.00, its par value, is to be applied to the company's capital account, $3.00 is to be paid to the salesman actually selling the stock, and that out of the balance of $2.00 the expenses of organization, rent, etc., are to be first paid, and the remainder of the $2.00 is to be paid to Obenshain for conducting the stock sales organization; that Obenshain is to have charge of the organization of the corporation and the stock sales, and after deducting from each $25.00, first,

"It is further mutually agreed and understood that as soon as a sufficient amount of preferred and common stock shall have been sold in the combinations above referred to to create a fund of $237,500.00, which is sufficient to buy in and cancel the stock of the Frid-Mullins Coal and Coke Company, Inc., that then and in that event in the discretion of the parties hereto, there shall not be issued any further amounts of preferred stock. And it is further mutually agreed and understood that there shall be no further issue of common stock unless the parties hereto mutually agreed to issue the residue of the common stock, and when so issued, it shall be issued in proportions of two-fifths (2-5) thereof to W. P. Henritze and three-fifths (3-5) to H. E. Obenshain and his associates.

"It is further mutually agreed and understood that the said W. P. Henritze, who at present owns and controls all the stock of the Frid-Mullins Coal and Coke Company, Inc., shall at once put the same into the hands of Naman Jackson, cashier of the First National Bank of Logan, West Virginia, so that as fast as the money is derived from the sale of the stock as hereinabove provided (sufficient to take up the stock of the said Frid-Mullins Coal and Coke Company, Inc.), the said stock shall be available and shall be turned over to the proper officers of the new proposed corporation, in order that the same may be cancelled and the stock in the new corporation issued in lieu thereof. It being understood and agreed that James E. Walker and C. S. McNulty have jointly put up the sum of $25,000.00 as a cash payment to W. P. Henritze on account of the purchase of the stock of the Frid-Mullins Coal and Coke Company, Inc., and that there has been turned over to the said James E. Walker and C. S. McNulty 277½ shares of the capital stock of the said Frid-Mullins Coal and Coke Company, Inc.

"It being understood and agreed that the $25,000.00 payment to W. P. Henritze represents an undivided interest in the holdings of the Frid-Mullins Coal and Coke Company, Inc., equalling 250 acres of the land, owned by said corporation. but in the event that the proposed corporation is organized and the proposed issue of stock is sold so as to realize the sum of $237,500.00,

$20.00 for capital, and second, $3.00 for the agent's commissions, the remainder of each $25.00 shall be paid to him for his services, and that out of this remainder he is to pay Henritze twenty cents on the dollar and the residue of eighty cents on the dollar he is to retain for himself and his associates; and these associates of Obenshain are clearly Walker and McNulty, excluding Henritze.    If this contract had been spread upon the minutes of the company, it would have fully disclosed the connection and interests of all of the parties to the transaction, and there could have been no fair complaint, for it is conceded that $5.00 per share for selling

an amount sufficient to pay for the entire capital stock of the Frid-Mullins Coal and Coke Company, Inc., that then the said James E. Walker and C. S. McNulty shall not have, and do not desire, any undivided interest in the property itself, but the return of the $25,000.00 with interest at six per cent as paid by them out of the proceeds from the sale of the preferred stock, or at their option, they may have issued to them in lieu of a repayment of the said $25,000.00, $25,000.00 of preferred stock of the proposed corporation, and $25,000.00 of the common stock of the proposed corporation, said $25,-000.00 of preferred stock to be issued to them out of the first $125,000.00 of preferred stock to be sold by the proposed corporation, the $25,000.00 common stock being the shares of common stock which accompany the same.

"It is further agreed and understood that out of the $2.00 per share arising from the sale of the stock, that an amount sufficient shall be used to have an additional engineer's report on the property, which shall include opening up and facing up the several veins of coal to the best advantage possible, up to an expense of $500.00; and also to defray the expenses of getting out a sufficient number of prospectuses and advertising matter, etc.

"It is mutually agreed and understood that the deferred payments, with six per cent interest due the W. P. Henritze on account of the purchase price of the Frid-Mullins Coal and Coke Company, Inc., shall be paid by the proposed corporation in the following manner:   $50,000.00 within sixty days from April 6, 1917; and the residue as rapidly as the money is derived from the sale of the stock, but the entire purchase price must be paid within one year from April 6, 1917.

"James E. Walker and C. S. McNulty and H. E. Obenshain guarantee payment of interest at six per cent on the balance of $212,500.00 from April 6, 1917, until the charter is granted to the said proposed corporation.

"Witness the following signatures and seals, the day and year first above written.

"Signed

"W. P. Henritze      (Seal)
"James E. Walker      (Seal)
"C. S. McNulty      (Seal)
"H. E. Obenshain      (Seal)
"Frid-Mullins Coal and Coke Company, Inc.,
"By   W. P. Henritze,
"President."

the stock and for organization and promotion expenses is fair and reasonable.  Henritze testified that it was his clear and distinct understanding that both this contract and the subsequent contract of May 7th were to be spread upon the minutes, and they all testify, Obenshain being a witness for the appellant, that there was no intention to secrete either, or to conceal any of their provisions.  While not spread upon the minutes, it is shown by minutes of the first meeting of the promoters of the company, held April 16th, the proposition of Henritze to sell to the corporation was accepted, and after the corporation was organized, at the stockholders' meeting on April 30, 1917, this contract dated April 16 was presented, specifically referred to and its obligations assumed.*

---

*"The first meeting of the stockholders of the Burneagle Coal and Coke Corporation was held in the offices of McNulty and Engleby, 702-704 Payne building, Roanoke, Virginia, on the 30th day of April, 1917, the following stockholders being present:

"Jas. E. Walker, C. S. McNulty and J. H. Matthews.  James E. Walker was elected chairman of the meeting and J. H. Matthews secretary.

"The secretary presented the certificate of incorporation of the Burneagle Coal and Coke Corporation, which on motion was accepted as the charter, and the secretary was directed to spread the same in the minutes of the corporation.

"A contract in writing was then presented between W. P. Henritze and Jas. E. Walker, C. S. NcNulty and H. E. Obenshain, wherein W. P. Henritze, who is president of the Frid-Mullings Coal and Coke Company, Incorporated, a corporation organized under the laws of the State of West Virginia, and is also the owner of all of the stock of in said corporation, agrees to sell to said corporation to be organized his holdings of the entire capital stock of the Frid-Mullins Coal and Coke Company, Incorporated, and to cause to be conveyed by the said corporation, with covenants of general warranty, the real estate of said corporation consisting of 2,370 acres, more or less, the coal lands in the counties of Logan and Mingo, in the State of West Virginia, to the corporation to be organized, in consideration of $237,-500.00 in money and $100,000.00 par value of the common stock of the said corporation, which latter is to be issued to him or whomsoever he may designate, which contract was offered by the said James E. Walker, C. S. McNulty, H. E. Obenshain and W. P. Henritze for its acceptance, provided it would undertake the obligations imposed, whereupon upon motion, duly seconded, the following resolution was unanimously adopted.

"Whereas, W. P. Henritze, who is president of the Frid-Mullins Coal and Coke Company, Incorporated, and the holder of the entire capital stock of the said corporation, proposes to sell to the Burneagle Coal and Coke Corporation his entire holdings of the stock of the Frid-Mullins Coal and Coke

Considering the question at this stage as it affects Henritze, it seems to us perfectly clear that the contract was thus accepted by the company through Obenshain, Walker and McNulty as its representatives, and that there is nothing which fairly controverts Henritze's contention that he was dealing for himself with the independent representatives of the proposed corporation, and that all which was accorded to him under that contract was fairly promised to him as the independent vendor and complete owner of the property.

[4] In determining the responsibility of a promoter, care must be observed to note that such responsibility depends upon his actions and his true relation to the

Company, Incorporated, and to cause to be conveyed to the Burneagle Coal and Coke Corporation, with general warranty of title, all the real estate in fee simple of the Frid-Mullins Coal and Coke Company, Incorporated, in consideration of $237,500.00 and of 5,000 shares of the common stock of said corporation of the par value of twenty dollars ($20.00) per share, the payments to be made to the said W. P. Henritze as follows: $25,000.00 cash; $50,000.00 on or before June 6, 1917, and the residue within twelve months from April 6, 1917, or as soon after that time as sufficient stock shall have been sold to raise the money for payment; the common stock to be delivered when the company shall have sold the said $250,000.00 worth of stock as above set forth.

"Now, be it resolved, that the stockholders of the Burneagle Coal and Coke Corporation hereby accept the proposition and assume the contract, and instruct the directors of this corporation to carry out the said contract by making payments thereon to the said W. P. Henritze in accordance with the provisions of said contract.

"On motion, duly seconded, it was further resolved that 14,375 shares of the preferred stock in said corporation and 12,500 shares of the common stock in said corporation be offered for sale on the following basis: 6,250 shares of the preferred stock and 6,250 shares of the common stock of the par value of twenty dollars ($20.00) per share shall be sold at the accommodation price of twenty-five dollars ($25.00) for one share of common stock and one share of preferred stock; 6,250 shares of preferred stock and 3,125 shares of common stock are to be sold at the accommodation price of fifty ($50.00) dollars for two shares of preferred and one share of common stock, $25.00 for one share of preferred and a half share of common stock, and in addition the said corporation shall issue to the said W. P. Henritze or his assignees the 5,000 shares of common stock as above provided.

"On motion, duly seconded, the officers and board of directors named in the charter of the Burneagle Coal and Coke Corporation were accepted as the officers and directors for the ensuing year and the annual stockholders meeting was fixed for the first Tuesday in May, 1917.

"There being no further business the meeting adjourned.

"Jas. E. Walker,
"Chairman."

company, and not upon the name by which he is called. The mere designation of a party to a contract as a promoter does not of itself bring him into a fiduciary relationship with and consequent fiduciary obligation to the corporation. This proposition is stated by Ehrich on Promoters, page 16, in this language:

"It must, however, be remembered that calling a person a 'promoter' does not of itself impose any responsibility upon him. The responsibility of the promoter depends upon what he does, not upon the name by which he is called. 'Care must be taken,' says Lord Justice Lindley, 'not to be misled by words.' Owing to the ambiguity in the meaning of the word promoter, and the difficulty of defining his exact relation to the company he procures to be formed, it is unsafe to say that any particular person was a promoter of a particular company, and to infer from thence that he is liable to account to it as if he had been its trustee. The question in each case must be, what has the so-called promoter done to make himself liable to the demand made against him? What fraud or breach of trust has he committed or been party or privy to? If none, he is under no liability; if any, he is liable accordingly by whatever name he may be called or by whatever terms his relation to the company may be expressed." Citing *Brooker* v. *Wm. H. Thompson Trust Co.*, 254 Mo. 125, 162 S. W. 187, 194; *Lydney & Wigpool Iron Ore Co.* v. *Bird*, L. R. 33 Ch. Div. 85, 93, 24 Am. & Eng. Corp. Cas. 23; Lindley on Companies Law, 5th ed. 349, 6th ed., volume 1, page 488.

[5] The question of fact as to whether or not one is a promoter must be first decided before the consequent legal obligations resting upon a fiduciary can be imposed upon him. Many efforts have been made by courts to define a promoter, but no perfectly satisfac-

tory definition has yet been made which will apply under all circumstances.

[6] This from *Richlands Oil Co.* v. *Morriss*, 108 Va. 288, 61 S. E. 762, is helpful in this case: "A promoter is a person who brings about the incorporation and organization of a corporation. He brings together the persons who become interested in the enterprise, aids in procuring subscriptions, and sets in motion the machinery which leads to the formation of the corporation itself. A person who procures subscriptions and aids in organizing the company, and frames the papers and manages the procuring of options, and the vesting of title is a promoter."

In *Old Dominion Copper Mining & Smelting Co.* v. *Bigelow*, 203 Mass. 159, 89 N. E. 193, 40 L. R. A. (N. S.) 327, this is said: "In a comprehensive sense 'promoter' includes those who undertake to form a corporation, and to procure for it rights, instrumentalities and capital by which it is to carry out the purposes set forth in its charter, and to establish it as fully able to do its business."

[7] Tested by these suggestions, it is perfectly clear from the facts recited that Henritze was not in fact a promoter of the Burneagle company. The testimony shows that he positively declined to become an incorporator, officer, or director, until long after he had been paid for the property in full, and he neither procured its charter, secured its capital, selected its directors, nor conducted its operations. Until the purchase money so contracted for was paid to him, he clearly maintained the relation of vendor and importunate creditor demanding payment of his debt.

On May 7, 1917, there was a modification of the written contract dated April 6, entered into between Hen-

ritze, Walker, Obenshain and McNulty.* From this
contract it is seen that Walker, Obenshain and McNulty
surrender their claim under the preceding contract to
take $150,000.00 of the common stock as compensation
for the organization and promotion of the company, and
Henritze agreed in lieu thereof to give them one-half of
his $100,000.00 of the common stock originally pro-
vided for as part of the purchase price. This, it is ob-
served, was after the binding contract of April 16th had
been executed, and was manifestly advantageous to the
other stockholders for it reduced the authorized com-
mon stock from $500,000.00 to $350,000.00, and that
part of such capital stock going to Henritze and the
promoters from $250,000.00 to $100,000.00. As to this
also Henritze testifies that he understood that it too
would be recorded in the minutes of the company.

---

*This memorandum of agreement, made this 7th day of May, 1917, be-
tween James E. Walker, W. P. Henritze, H. E. Obenshain and C. S. McNulty;
  "Witnesseth:
  "That whereas, the parties hereto did on the 6th day of April, 1917,
enter into a certain contract in writing, signed by them and also by the Frid-
Mullins Coal and Coke Company, Inc., in which said agreement it was
stipulated and agreed that a corporation be formed to take over the holdings
of the Frid-Mullins Coal and Coke Company, Inc., and that the said pro-
posed corporation issue preferred and common stock—preferred stock in the
sum of five hundred thousand dollars ($500,000.00) to bear seven per cent
(7%) cumulative dividends, common stock in the sum of five hundred
thousand dollars ($500,000.00). The said agreement further reciting that
$250,000.00 of the common stock shall go to the promoters and organizers
of the proposed corporation.
  "Acting upon the said contract of April 6, 1917, the Burneagle Coal and
Coke Corporation, incorporated under the laws of the State of Virginia, has
been organized and granted a charter.
  "The parties hereto, after maturely considering the amount of capital
stock to be issued to the promoters and organizers of said corporation, have
come to the conclusion that the said corporation is over capitalized, and
that the amount of the common stock to be issued to the promoters of the
said corporation be decreased and changed, and that $100,000.00 of the com-
mon stock of said corporation only be issued to the said promoters; and it
is hereby mutually agreed and understood that the said $100,000.00 of the
common stock of the Burneagle Coal and Coke Corporation shall be issued
to the parties hereto in the following proportions:
  "$50,000.00 of said common stock shall be issued to the said W. P. Hen-
ritze, as his share of the promoters' stock.
  "$20,000.00 of the said common stock shall be issued to the said James E.
Walker, as his share of the promoters' stock;

[8] The question in this case, as in most cases, is whether or not the promoters have taken secret profits, and that the stockholders have been thereby deceived and defrauded, so that their capital has been clandestinely diverted from the treasury of the company to the profit and use of the promoters.   In this case there is little reason for supposing that any intelligent subscriber to the stock did not actually know how his money was to be applied.   The stock statement filed with the State Corporation Commission before the stock was issued showed that the $237,500.00 of the purchase price for the property was to be raised from the sale of stock, and that $100,000.00 of the common stock was to be paid to the vendor as a part of the purchase price; and the statement filed on the 31st day of May, two days later, showed that from each $25.00 paid into the company, a commission of twenty per cent thereof,

"$20,000.00 of the said common stock shall be issued to the said C. S. McNulty, as his share of the promoters' stock;

"$10,000.00 of the said common stock shall be issued to the said H. E. Obenshain, as his share of the promoters' stock. .

"It being mutually agreed and understood that the minutes of the Burneagle Coal and Coke Corporation, when they shall have been prepared, shall show the said $100,000.00 as being issued as a part of purchase price of the holdings of the Frid-Mullins Coal and Coke Company, Inc., and this paper is signed by W. P. Henritze and agreed to by him as authorizing the officers of the corporation to issue the said $100,000.00 in the amounts hereinabove set forth to himself, James E. Walker, C. S. McNulty and H. E. Obenshain.

"And it is further mutually agreed and understood that the total issue of the stock of the Burneagle Coal and Coke Corporation shall be $500,000.00 preferred and $350,000.00 common.

"It is mutually agreed and understood that this memorandum is supplemental to and forming a part of the agreement of April 6, 1917, hereinabove referred to, and that all other clauses contained in the said original agreement, except those that are changed by this memorandum, are to remain in full force and are to be carried out by the parties thereto.

"Witness the following signatures and seals, the day and year first above written.

"Signed

"James E. Walker   (Seal)
"W. P. Henritze   (Seal)
"H. E. Obenshain   (Seal)
"C. S. McNulty   (Seal)"

$5.00, was to be paid to the agents for the sale of the stock, and that eighty per cent thereof, $20.00, would be paid into the treasury of the company; so that each subscriber to the stock was notified that only $20.00 (par value) of each $25.00 subscription would be paid into the treasury of the company.   It is true that it was unquestionably the duty of McNulty, Walker and Obenshain to have these contracts spread upon the records of the company, and it is equally true that they as promoters and officials of the corporation owed to the stockholders the duty of reporting to the Commission fully and frankly every fact and circumstance shown by these contracts, together with the disposition which was to be made of the funds collected, with the same detail as is shown in the contracts.   For their dereliction in this respect, however, Henritze is not responsible.

The case may be considered from another aspect. The board of directors was increased to ten, May 25, 1918.   Henritze had not been paid his purchase money in accordance with the contract, and, in the fall of 1919, insisted upon final payment of the balance due, which had been so long delayed.   There were meetings of the directors in November and December, 1919, at which the question of settlement under this contract was considered.   Three of the directors denied that they had any knowledge of the contract, but McCorkle, McNulty Ninninger, directors, and Gillespie, president and director, each testified clearly that the contract was read at either one or the other of those meetings.   Indeed it is not impertinent to inquire how this board of directors, presuming them to be men of average intelligence and conscious of their duty to the stockholders, could possibly have concluded to pay Henritze the balance of the purchase price without inquiring as to the details of

the contract under which Henritze was demanding settlement. However that may be, the weight of the testimony is to the effect that this independent board of directors, having neither responsibility for, nor connection with, the original contract, more than two years after its execution, held meetings for the express purpose of determining how the company would discharge its overdue obligations to Henritze, and at those meetings sold Henritze the timber upon the land, personally endorsed notes, and provided for raising funds sufficient to satisfy his entire demand for the purchase price. So that for the second time directors of the company treated with Henritze as an independent vendor, ratified and approved his contract, and in January, 1920, paid him the balance thus admitted to be due him for his property.

The resolution authorizing this suit was not adopted until April, 1922, so that if it were necessary we should have to consider whether it is barred by laches. There are other details, but the determination of this question makes it unnecessary to say more as to this branch of the case.

[9, 10] The appellant asked for no relief against Obenshain, their reason for this being, as the bill shows, that his compensation for services in selling the stock and for other expenses was fair and reasonable in amount. They accepted from him the return for cancellation of his proportion of the promoters' stock, and relied upon him as a witness. The trial court, by its decree, gave the appellant the same relief against McNulty and Walker. It does not seem inequitable that the relief which the appellant accepted as adequate from Obenshain should be also held by the court adequate as to his associates who were the other two promoters. That all three of them withheld from the

stockholders the information that they were jointly receiving one-half of the $100,000.00 of stock originally contracted to be paid to Henritze as part of the purchase price is manifest. The trial court holds that the "defendants were not guilty of *mala fides*, conspiracy to defraud or fraud in the purchase of the property in the bill mentioned, or in the promotion of the plaintiff corporation, but that such grounds of complaint as complainant may have are purely technical, and that thereby no substantial injury has been done complainant; that the material allegations in the bill are not sustained by proof, and that full and substantial justice will be done complainant by simply requiring James E. Walker and C. S. McNulty to restore the common stock received by them, doth so adjudge, order and decree." It is perfectly apparent that every subscriber to the capital stock of the company must have realized that such a subscription was highly speculative in its nature and that any return therefrom would be dependent upon the mining and sale of the coal which is shown to be on the property. The common stock whi h the promoters received was absolutely worthless then and would be unless the property should be developed and thereafter until the preferred stock, which those who subscribed received for their money, had been first fully taken care of out of the profits of the company in case the adventure should ultimately prove successful. McNulty and Walker worked diligently for several years in their efforts to develop the property and those who subscribed to the stock must not only be charged with knowledge of all that the records of the company show, of all that the statements to the Corporation Commission disclosed, but also with the knowledge that these promoters expected in some way to be paid for their diligent and persistent efforts. While we do not intend by any

expression in this opinion to intimate that promoters. must not be held to the strictest accountability, the determination of each case must generally depend upon its own peculiar facts. Significant facts here are, that. the subscribers to the stock did have notice of the precise amount and proportion of their subscriptions which were to be paid into the treasury of the company,. namely, $20.00 for each $25.00 paid in, and they also had notice of the existence of a contract with Henritze, as vendor, which fact the corporate records disclosed. and which the slightest diligence on their part would have uncovered completely, for several copies of it were made; and there is no reason to discredit the testimony of Obenshain, McNulty and Walker, that no secrecy was either planned or intended. Because of their dereliction (and it is a serious dereliction), the court has. properly required McNulty and Walker to return for cancellation the common stock which they received from Henritze, which constitutes a source of contingent. and possible profit to them as promoters not disclosed by them to the stockholders.

There is complaint that the court decreed in favor of McNulty for an account for services rendered to the company as attorney at law. He testified as to the services which he had performed, there is no contradiction of his evidence, and the case was submitted upon. this as well as upon the other issues. We find no legal. reason for reopening this question, because the evidence is sufficient to sustain the decree on this point.

It is apparent that by inadvertence the court failed to require McNulty to account for a transit bought for the company for the use of its surveyors, and certain office furniture of inconsequential value. The decree will be amended so as to preserve the rights of the company to recover this property, or its value.

While there is much in the record to which we have not alluded, there is nothing which can change our view, unless we are prepared to discredit the uncontradicted testimony of the witnesses who are most familiar with the transactions under investigation. The complainants have failed to sustain the more serious allegations of their bill, and the decree of the trial court, with the slight modification indicated, has afforded the relief to which, under this record, they are entitled.

*Amended and affirmed.*