FRANK CROCKER, TRUSTEE IN BANKRUPTCY OF POSTAL SERVICE AND LOCK COMPANY *v.* UNITED STATES.

APPEAL FROM THE COURT OF CLAIMS.

No. 77. Argued December 1, 2, 1915.—Decided January 31, 1916.

The findings of the Court of Claims in an action at law determine all matters of fact precisely as a verdict of a jury, and this court cannot refer to the opinion for the purpose of eking out, controlling or modifying their scope.

Secret arrangements with government officials by which they share in profits on contracts which they have a voice in awarding are most reprehensible, and vitiate the contract, justifying its rescission, even if made by those negotiating the contract on behalf of the contractor and without the actual knowledge of the latter.

No recovery can be had upon a government contract tainted with fraud and rescinded by the proper officer of the Government on that ground.

The rescission of a government contract to supply articles at a specified price is not an obstacle to a recovery upon a *quantum valebat,* if there was requisite proof of the value of the articles delivered.

Where there is fraud in obtaining the contract, the contract price of the articles cannot for the *quantum valebat* be regarded as an admission by the Government of the value of the articles delivered prior to the discovery of the fraud and rescission of the contract.

The burden of proof to establish value upon a *quantum valebat* for articles delivered under a contract rescinded for fraud is on the claimant; and if the Court of Claims made no finding of value in that respect and stated in explanation there was complete absence of evidence there can be no recovery. In this instance, the case will not be remanded for findings on the question of value.

49 Ct. Cl. 85, affirmed.

THE facts, which involve a claim against the United States for letter carriers' satchels and the effect of fraud on the right of the contractor to recover therefor, are stated in the opinion.

*Mr. James H. Hayden,* with whom *Mr. Robert C. Hayden* was on the brief, for appellant.

*Mr. Assistant Attorney General Huston Thompson* for the United States.

MR. JUSTICE VAN DEVANTER delivered the opinion of the court.

This is a claim for furnishing letter carriers' satchels under a contract with the Postmaster General. The contractor was a New Jersey corporation and its trustee in bankruptcy is the present claimant. In the Court of Claims a small part of the claim was sustained and the balance rejected. 49 Ct. Cls. 85. Only the claimant appeals, so the part sustained is not here in controversy.

As shown by the findings the facts are these: By public advertisement in May, 1902, the Postmaster General solicited bids for furnishing letter carriers' satchels for the free delivery service for a period of four years. Shortly after the advertisement the New Jersey company and one Lorenz entered into a written agreement whereby the company employed him to assist in securing for it the contract for furnishing the satchels, it being particularly stipulated that he and the company's vice-president, one Crawford, should determine the bid to be made and should present it in the company's name; that, if the company got the contract, Lorenz should receive all profits arising out of the same in excess of twenty-five cents on each satchel, and that, if the company did not get the contract, he was to accept one dollar as full payment for his services. Lorenz and Crawford then entered into a secret arrangement with one Machen, who was superintendent of the free delivery service and charged with important duties relating to the purchase of the satchels, whereby, in the event the company got the contract, Lorenz's share of the profits was to be divided among them on the basis of one-half to Machen and one-fourth to each of the others. After this arrangement was made a bid for the satchels was prepared and submitted in the company's name, and was accepted by the Postmaster General. The contract sued upon followed in regular course, the company agreeing therein to furnish the satchels in such quantities and at such times as the post office authorities might direct. The satchels were to be of three classes, those of classes A and C to have shoulder straps and those of class B to be without straps. The prices to be paid by the Government were $2.19 for each satchel of class A; $3.16 for each of class B, and $3.15 for each of class C. This included the shoulder straps on those of classes A and C. The company was not a manufacturer of satchels or of the materials used in making them, and to enable it to comply with

the contract it arranged, through Crawford, to have the
satchels made by a manufacturer at Hartford, Conn.
But, as the manufacturer could not supply shoulder straps
of the type required, the company and Lorenz entered into
a further agreement to the effect that Lorenz should supply
the shoulder straps, that out of what was paid by the
Government for the satchels the company should pay
him 45 cents on each satchel of class A, $1.19 on each of
class B and 84 cents on each of class C as his share of the
profits and to reimburse him for supplying the straps.
Crawford and Machen had conferred about the straps
and Machen had said that the Government would get
the straps, pay for them, send them to the company's
manufacturer and adjust any difference afterwards.

Thereafter and prior to March 17, 1903, the company
furnished over 10,000 satchels pursuant to the terms of
the contract, save that the shoulder straps on those of
classes A and C, which were in excess of 5,000, were pro-
vided and paid for by the Government, through Machen,
at a cost of $39\frac{1}{2}$ cents each. These satchels were all paid
for by the Government, through Machen, at the contract
rates without any deduction for the straps. Out of the
moneys so received the company paid Lorenz 45 cents
on each satchel of class A, $1.19 on each of class B and
84 cents on each of class C, and he in turn divided what
he received with Machen and Crawford.

Between March 17 and April 30, 1903, the company
furnished 6,201 more satchels pursuant to the terms of
the contract, save that the shoulder straps on those of
classes A and C, of which there were 4,912, were provided
and paid for by the Government, through Machen, at a
cost of $39\frac{1}{2}$ cents each. These satchels were accepted
and retained by the post office authorities. But when
payment for them under the contract was requested, it
was refused. This was because the Postmaster General
had then learned of the corrupt arrangement giving

Machen an interest in the profits and had rescinded the contract and stopped further payments under it.

No shoulder straps were furnished by the company, through Lorenz or otherwise, and both he and Crawford knew that the straps were purchased and supplied by the Government. Before the rescission by the Postmaster General the company did not know that Machen was to share or was sharing in the profits, or that the Government was supplying the shoulder straps, save as the company may have been chargeable with the knowledge of Lorenz and Crawford who represented it in securing and executing the contract.

It was for furnishing the 6,201 satchels after March 17, 1903, that a recovery was sought in the Court of Claims and the part of the claim rejected was for the 4,912 satchels of classes A and C, the rejection being put on the grounds (a) that no recovery could be had upon the contract, because it called for satchels with shoulder straps and the company did not furnish the straps, and (b) that no recovery could be had upon a *quantum valebat*, because the value of the satchels as furnished was not shown.

In the briefs reference is made to portions of the opinion delivered in the Court of Claims as if they were not in accord with the findings. We do not so read the opinion, but deem it well to observe, as was done in *Stone* v. *United States*, 164 U. S. 380, 382, 383, that "the findings of the Court of Claims in an action at law determine all matters of fact precisely as the verdict of a jury," and that "we are not at liberty to refer to the opinion for the purpose of eking out, controlling or modifying the scope of the findings." See also *Collier* v. *United States*, 173 U. S. 79, 80; *United States* v. *New York Indians*, 173 U. S. 464, 470.

We are of opinion that in the transactions out of which the claim arose there was an obvious departure from recognized legal and moral standards. It began when the company employed Lorenz, upon a compensation contin-

gent upon success, to secure the contract for furnishing the satchels, and it persisted until its discovery by the Postmaster General led to the rescission of the contract. Because of their baneful tendency, as here illustrated, agreements like that under which Lorenz was employed are deemed inconsistent with sound morals and public policy and therefore invalid. Dealing with such an agreement this court said in *Tool Co.* v. *Norris,* 2 Wall. 45, 54–55: "All contracts for supplies should be made with those, and with those only, who will execute them most faithfully, and at the least expense to the Government. Considerations as to the most efficient and economical mode of meeting the public wants should alone control, in this respect, the action of every department of the Government. No other consideration can lawfully enter into the transaction, so far as the Government is concerned. Such is the rule of public policy; and whatever tends to introduce any other elements into the transaction, is against public policy. That agreements, like the one under consideration, have this tendency, is manifest. They tend to introduce personal solicitation, and personal influence, as elements in the procurement of contracts; and thus directly lead to inefficiency in the public service, and to unnecessary expenditures of the public funds. . . . Agreements for compensation contingent upon success, suggest the use of sinister and corrupt means for the accomplishment of the end desired. The law meets the suggestion of evil, and strikes down the contract from its inception. There is no real difference in principle between agreements to procure favors from legislative bodies, and agreements to procure favors in the shape of contracts from the heads of departments. The introduction of improper elements to control the action of both, is the direct and inevitable result of all such arrangements." Further recognition of this rule is found in *Marshall* v. *Balt. & Ohio R. R.,* 16 How. 314,

334, 335; *Trist* v. *Child*, 21 Wall. 441; *Meguire* v. *Corwine*, 101 U. S. 108; *Oscanyon* v. *Arms Co.*, 103 U. S. 261, 273; *Sage* v. *Hampe*, 235 U. S. 99, 105.

The secret arrangement whereby Machen was to share in the profits was most reprehensible. Its natural effect, as also its purpose, was to secure for the company an inadmissible advantage. The satchels were wanted for the free delivery service and Machen's relation to that service made it probable, if not certain, that his advice respecting the reasonableness of the bid, the number of satchels required from time to time, and the company's performance of the contract, would be sought and given consideration by his superiors in the Post Office Department. The advertisement for bids, the postal regulations (ed. 1902, §§ 17 and 70) and the findings leave no doubt that he was charged with important duties of that character. Public policy and sound morals forbade that he should have any personal interest in the bid or contract lest he might be tempted to advance that interest at the expense of the Government. Under the secret arrangement, which was made before the bid was submitted, he had such an interest and therefore was in a position where the hope of personal gain was likely to exercise a predominant influence and prevent a faithful discharge of his public duties, as in fact it did. Referring to this arrangement, this court said in *Crawford* v. *United States*, 212 U. S. 183, 192: "Its almost necessary result, if carried out, would be to defraud the United States. The fraud might be perpetrated by getting the contract at a higher price than otherwise would have been obtained, or, if already obtained, then the United States might be defrauded by the General Superintendent [Machen] accepting improper satchels, not made of the materials, or in the manner specified in the contract, or by his requiring the delivery of more satchels than were sufficient for the wants of the department. . . . Such a corrupt agreement, if

carried out, would naturally, if not necessarily, result in defrauding the United States by causing it to pay more for satchels than was necessary, or for more satchels, or possibly inferior ones, than it otherwise would, but for the corrupt agreement set forth."

Of course, the secret arrangement with Machen operated to vitiate the company's contract and justified the Postmaster General in rescinding it on discovering the fraud. *Wardell* v. *Un. Pac. R. R.*, 103 U. S. 651, 658; *Thomas* v. *Brownville &c. R. R.*, 109 U. S. 522, 524; *McGourkey* v. *Toledo & Ohio Central R. R.*, 146 U. S. 536, 552, 565; *Smith* v. *Sorby*, L. R. 3 Q. B. Div. 552; *Harrington* v. *Victoria Graving Dock Co.*, *ibid.* 549; 2 Dillon Municipal Corporations, 5th ed., § 773. And this is so, even though the company was without actual knowledge of the corrupt arrangement. It was made by Lorenz and Crawford while endeavoring to secure the contract for the company and was a means to that end. They were the company's agents and were securing the contract at its request. It accepted the fruits of their efforts and thereby sanctioned what they did and made their knowledge its own. *Krumm* v. *Beach*, 96 N. Y. 398, 404; *Fairchild* v. *McMahon*, 139 N. Y. 290; *White* v. *Sawyer*, 16 Gray, 586, 589; *First National Bank* v. *New Milford*, 36 Connecticut, 93, 101; *Barwick* v. *English Joint Stock Bank*, L. R. 2 Ex. 259, 265; *Mackay* v. *Commercial Bank of New Brunswick*, L. R. 5 P. C. 394, 410, *et seq.;* Leake on Contracts, 6th ed., 255, 335–336; Wald's Pollock on Contracts, 3d ed. 392.

It results that no recovery could be had upon the contract with the Postmaster General, because it was tainted with fraud and rescinded by him on that ground. But this was not an obstacle to a recovery upon a *quantum valebat.* *Clark* v. *United States*, 95 U. S. 539, 543; *Wardell* v. *Un. Pac. R. R.*, *supra*, p. 659; *Thomas* v. *Brownville &c. R. R.*, *supra*, p. 525. Whether requisite proof was made of the value of the satchels as furnished is another

question. The Court of Claims made no finding of their value and, in explanation of this, said that there was "a complete absence" of evidence upon the subject. The burden of proof was with the claimant and, if he failed to carry it, he is not in a position to complain—especially as it appears that the Government seasonably objected that he had not proved the value. He insists, however, that the findings show the price at which the Government contracted to take the satchels with the shoulder straps and also what it cost the Government to supply the straps and that the difference should be regarded, in the absence of other evidence, as representing the value of the satchels as furnished, that is, without the straps. The insistence proceeds upon the theory that the contract price was in the nature of an admission by the Government of the value of the satchels with the straps. However this might be in other circumstances, it is wholly inadmissible here, for the fraud with which the contract was tainted completely discredited the contract price and prevented it from being treated as an admission of the value by the Government. It therefore was incumbent upon the claimant to show the value by other evidence and, as this was not done, no recovery could be had upon a *quantum valebat.*

*Judgment affirmed.*

Mr. Justice McKenna and Mr. Justice Holmes dissent, being of opinion that the case should be remanded for findings on the question of value.

Mr. Justice McReynolds took no part in the consideration or decision of this case.