## CAMPBELL v. UNITED STATES.

(Circuit Court of Appeals, Ninth Circuit. April 30, 1926. Rehearing Denied June 21, 1926.)

### No. 4671.

**1. Post office ⚎49.**

Evidence on trial for using mails to defraud, in violation of Cr. Code, § 215 (Comp. St. § 10385), *held* sufficient prima facie to charge defendant with responsibility for representations in advertising matter.

**2. Post office ⚎49—Evidence of use of mails by one party to scheme to defraud admissible against others.**

Evidence of use of the mails in furtherance of a scheme to defraud by means of such use, by one of the parties to the scheme, is admissible against the other parties.

**3. Criminal law ⚎1169(1)—Admission of evidence of remark of defendant in prosecution for fraudulent use of mails held harmless.**

On trial for using mails to defraud in connection with sales of units in oil syndicate, admission in evidence of remark of defendant that refinery could not be built without money, in attempting to prove promise to build refinery, *held* harmless, if improper.

**4. Post office ⚎50—Instruction attacked as misstating evidence held not substantially inaccurate (Act Feb. 25, 1920, § 13 [Comp. St. Ann. Supp. 1923, § 4640¼ff]).**

On trial for using mails to defraud in sale of units in oil syndicate, instruction on assumption that defendant had misrepresented syndicate's interest in oil lands, some of which were held under prospecting permit under Act Feb. 25, 1920, § 13 (Comp. St. Ann. Supp. 1923, § 4640¼ff), attacked as misstating the evidence, *held* not substantially inaccurate.

**5. Post office ⚏35—Failure of manager of syndicate to inform buyers of units of extraordinary expenses incurred by him for stock selling held breach of trust and fraudulent (Rev. Codes Mont. 1921, §§ 7888, 7894).**

By Rev. Codes Mont. 1921, §§ 7888, 7894, it is made the duty of a trustee to act in the utmost good faith to those for whom he acts, and failure of the manager of a syndicate to inform those to whom sales of units were made through the use of the mails, that by contracts made by him approximately 50 per cent. of the proceeds of sales was paid as commissions and expenses to sales agents, was a breach of trust and a fraud upon them.

**6. Post office ⚏35—Representation that unsold units in syndicate were underwritten was representation that there was agreement to take them, but reference to amount of capital did not prevent expenditure.**

Representation by one selling units in oil syndicate through mails that unsold units had been underwritten was a representation that some one had agreed to take and pay for all shares not sold, but mere mention in circulars of amount of syndicate's capital stock did not make expenditure of money for purposes of trust before entire capital was raised wrongful.

**7. Criminal law ⚏1186(4)—Inaccuracy in instruction as to reason for holding expenditures improper held not reversible error (Judicial Code, § 269, as amended by Act Feb. 26, 1919 [Comp. St. Ann. Supp. 1923, § 1246]).**

Instructions, giving incorrect reason for holding improper expenditures of money of syndicate in which defendant was selling units, *held* not to contain reversible error, in view of Judicial Code, § 269, as amended by Act Feb. 26, 1919 (Comp. St. Ann. Supp. 1923, § 1246), which devolves on a plaintiff in error the burden of showing that an inaccuracy in an instruction deprived him of a substantial right.

Rudkin, Circuit Judge, dissenting.

In Error to the District Court of the United States for the District of Montana; George M. Bourquin, Judge.

Criminal prosecution by the United States against Gordon Campbell. Judgment of conviction, and defendant brings error. Affirmed.

Plaintiff in error, hereinafter called the defendant, was indicted jointly with Charles F. Bloomhuff and Edward J. Dailey for using the mails to defraud in violation of section 215 of the Criminal Code (section 10385, Comp. St.). There were six counts in the indictment; the first five charging violations of the above statute, and the sixth charging a conspiracy to violate it. At defendant's request he was granted a separate trial. He was convicted on the first count and acquitted on the others.

W. F. O'Leary and Ayres & Toole, all of Great Falls, Mont., and S. C. Ford, of Hel-

ena, Mont. (Eugene C. Campbell, of Long Beach, Cal., of counsel), for plaintiff in error.

Wellington D. Rankin, U. S. Atty., of Helena, Mont., and John S. Pratt, Sp. Asst. Atty. Gen., for the United States.

Before GILBERT, RUDKIN, and McCAMANT, Circuit Judges.

McCAMANT, Circuit Judge. The first count of the indictment, on which alone the defendant was convicted, charges that the defendant, together with Bloomhuff and Dailey, had devised a scheme to defraud by the organization of an oil stock promotion company under the guise of a trust estate to be known as Gordon Campbell-Kevin Syndicate No. 2; that the scheme involved the sale to investors of 25,000 shares or units of the par value of $10 each; that the scheme contemplated the sale of these shares or units by false representations, and the appropriation by the defendant, Bloomhuff, and Dailey of large sums of money so realized to the use of the defendant, Bloomhuff, Dailey, Gordon Campbell Syndicate No. 1, and others. The indictment sets up in detail a number of the false and fraudulent representations made for the purpose of selling said shares, and alleges that on the 21st of June, 1922, the defendant and his associates, in furtherance of their scheme, placed in the post office at Kevin, Mont., a circular addressed to C. M. Curry, at Alberton, Mont.

The evidence abundantly sustained the allegations of the indictment. There was realized from the sales of shares the sum of $124,993.09. Of this sum $63,506.67 was expended for financing the enterprise, the larger items consisting of advertising, printing and postage, commissions, and the sum of $37,686.40 paid Bloomhuff for his services as a sales manager. Of the remaining $61,000, $14,394.36 was used by Gordon Campbell Petroleum Company, a corporation in which defendant and his wife were the sole beneficial stockholders, and $19,982.06 was used by Gordon Campbell-Kevin Syndicate No. 1, another oil enterprise promoted by defendant. Little more than 20 per cent. of the amount realized from sales was expended on the properties advertised as belonging to the syndicate. One of the wells sunk on behalf of Syndicate No. 2 produced a little oil, but not in paying quantities. The control and management of the enterprise by the defendant are clearly established.

[1] Error is assigned on the admission in evidence of a large number of letters and circulars sent through the mails by Bloomhuff and Dailey for the purpose of selling the shares

or units. The mail matter is relied on by the government as proof that false representations were made for the purpose of selling the shares. It appears that on the 1st of April, 1922, the defendant employed Bloomhuff as his agent to sell the syndicate units. The defendant agreed to pay Bloomhuff 20 per cent. of the gross amount received, the defendant to pay also the expenses incurred in effecting the sales. Late in 1922 this arrangement was superseded by another. Plaintiff employed Bloomhuff, Dailey, and Louis J. Wertheimer, operating as the Fidelity Finance Company, to sell the shares. They sold the syndicate units for $10 apiece, retaining $5 for themselves, and delivering the other $5 to the defendant. The practice was to submit all advertising matter to the defendant for his approval. Most of it went out over the defendant's fac simile signature. This practice continued for so long a time that the jury was warranted in assuming that defendant knew about it and acquiesced therein. A good deal of the literature went out from the defendant's office in Kevin, and even when it was sent out from Bloomhuff's office in Great Falls, the envelopes provided for its return if undelivered to defendant's office in Kevin. These returned parcels of mail were sent from time to time to Bloomhuff at Great Falls to aid him in correcting his list of addresses. The witness Zriny testifies that he kept some of this advertising matter in a scrapbook at defendant's request, and that defendant observed it. This was a sufficient prima facie showing to charge the defendant with responsibility for representations contained in the advertising matter.

[2] The testimony also established that defendant, Bloomhuff, Dailey, and Wertheimer were parties to the scheme charged in the indictment. The use of the mails was a part of their plan, and such use by any of them in furtherance of the scheme was evidence admissible against the defendant. Belden v. U. S., 223 F. 726, 730, 139 C. C. A. 256; Chambers v. U. S., 237 F. 513, 524, 150 C. C. A. 395; Preeman v. U. S., 244 F. 1, 17, 18, 156 C. C. A. 429; Spear v. U. S., 246 F. 250, 251, 158 C. C. A. 410.

[3] An exception was reserved to the admission of the testimony of the witness Zriny as to a conversation he had with the defendant. The witness was called for the purpose of proving that the defendant promised that the Campbell Oil Company was going to erect a refinery. The witness quoted the defendant as saying, "You cannot build a refinery without money." This testimony was harmless, even if improperly admitted.

[4] An exception was reserved to the following portion of the charge:

"When you advertise to the world or to a syndicate that you have this 40, it, from legal contemplation, means title in fee simple, and that all the oil goes to the syndicate; whereas, as a matter of fact he only had a leasehold in which I think the owner was getting 10 per cent. and then when he came to convey over to the syndicate he only deeded or assigned them half of that offset 40. So you can see that, while the advertising held out to the world that the syndicate was to get all the oil in that offset 40, as a matter of fact, when the well was drilled, and if they got any, they would only get 45 per cent. The defendant would first get 50 per cent. by virtue of his half interest, and then the royalties taken out, if you took 5 per cent. from each half. And the investors, the joint adventurers with him, would only get 45 per cent. of the oil—a very material misrepresentation. That is not saying that the defendant was responsible for it. We will come to that later.

"And, so it was for the 640. This literature spread to the world that it would have the other 640 acres. Now, that is not true, according to the admissions of the parties here to-day. He intended to turn over to this syndicate not 640 acres in fee simple, as the advertising purported to be, and was reasonably read in the light of the law, but only to turn over to them a half interest in a 640-acre lease. And, again, the same situation would result. The advertising holds out to the investors that they will get all the oil under that 640 acres, whereas, as a matter of fact, they would only have gotten 45 per cent. of the oil in any well that was struck. Any well that was drilled would benefit, of course, the other half interest exclusively held by the defendant. The syndicate would drill the well, and the defendant would enjoy that large benefit. There is nothing wrong in that, if it was made clear to the public, but it was never made clear to the public. It was never advertised. It was never disclosed. There was there misrepresentation and concealment and fraud, and the solicitation was fraudulent, providing it was done with the evil intent, which is to be inferred if it would lead to the evil result which any man can see it would do."

On the 40-acre tract referred to in the instruction, defendant had only a prospecting permit granted under the Act of February 25, 1920, 41 Stat. 441 (section 4640¼ff, Comp. St. Ann. Supp. 1923). On the 640 acres he had oil leases. A one-half interest in these rights and interests was assigned to the

syndicate shortly before the share-selling campaign ended. The charge is excepted to as misstating the evidence. In a circular sent to Alfred Foix of Kalispell, Mont., received in evidence as Exhibit 34, it is stated that the syndicate shares equally with the defendant in both the 40 acres and the 640 acres. The same statement is found in a circular received in evidence as Exhibit 8. In Exhibit 62 it is stated over defendant's signature:

"I am assigning to the Gordon Campbell-Kevin Syndicate No. 2 a 40 per cent. interest in both of these blocks of acreage with two wells guaranteed to be drilled (one on each tract) to a depth of not less than 2,000 feet, unless commercial wells are brought in at lesser depths."

In neither of these exhibits is there anything to rebut the presumption that there was a fee-simple title. In Exhibits 9 and 12 it is stated that the titles are leaseholds, but in neither of these exhibits is it stated that the syndicate is the owner of a one-half interest or less. On the other hand, in the advertising matter sent out, there are many references to the property in question as belonging exclusively to the syndicate, without anything to rebut the presumption that the titles are indefeasible. This is true of Exhibits 13, 21, and 43. The ultimate fact is that the advertising matter misrepresented the titles and the syndicate's interest therein. The inaccuracy in the charge, if any, was not substantial error.

[5] An exception is also reserved to the charge that the defendant was not entitled to pay commissions for the sale of shares out of the moneys received from such sales. There is authority for the proposition that a corporation may lawfully pay a reasonable commission for the sale of its stock. 1 Cook on Corporations (7th Ed.) § 42, p. 164; Scott v. Abbott, 160 F. 573, 87 C. C. A. 475. In such case the commission should be fixed by the board of directors, and the action taken should be entered in the corporate records. In this case the facts are not in dispute. Defendant was called as a witness. He did not controvert the government's testimony with reference to the payment of commissions and expenses for the sale of shares, but undertook to justify it. The commissions were paid under contracts made by the defendant and established by uncontroverted testimony. The commissions and expenses paid for the sale of shares or units were approximately 50 per cent. of the total receipts. The fact that these commissions were being paid was not disclosed to the shareholders. The defendant as trustee for the syndicate was bound to act in

the highest good faith to the shareholders. Revised Codes of Montana, 1921, § 7888. Under the Montana statute his failure so to do was fraud. Revised Codes of Montana, § 7894. It was his duty to make disclosure of the commissions paid. Hayward v. Leeson, 176 Mass. 310, 57 N. E. 656, 49 L. R. A. 725; Richlands Oil Co. v. Morriss, 108 Va. 288, 297, 61 S. E. 762; Goldman v. Cosgrove, 172 Wis. 462, 179 N. W. 673. Payment of a commission of 50 per cent. undisclosed to the parties interested is fraudulent as a matter of law. Wilson v. U. S., 190 F. 427, 439, 111 C. C. A. 231. The court did not err in charging that defendant had no right to make these payments.

[6] An exception was reserved to the following portion of the charge:

"Now here is another obligation on the part of this manager of the joint adventure. He is not entitled, under the law, to appropriate one cent of that money to his own uses or for any purposes, until he has gotten into that enterprise all those that every one expects to come in. For instance, in this case, he advertised $250,000 capital, 2,500 so-called units, at $10—25,000 units, at $10. * * * He must not touch that fund at all for any purpose until it is gathered together, and then is to be used to buy properties, and to operate. * * *

"It was generally advertised that the balance was underwritten, and that held out to the public, to every one who had read it, that they were sure to have the $250,000 capital. In other words, you would not contribute $10 for a unit and another man contribute $10 for a unit, if he did not feel some assurance that finally the full amount would be gotten together to buy property and operate. So when, of course, it was advertised to the world that all outstanding and not yet sold was underwritten, that meant to them that some one had agreed to take and pay for all that had not yet been sold, and it was an assurance that this full amount, $250,000 would be in the treasury, and that the project would then proceed under the care and management of the defendant."

After deliberating for a time, the jury asked for further instructions on this subject. A juror said: "There were several questions came up. No matter how the money was spent, if it was spent before the whole amount subscribed was in the treasury?"

The court thereupon charged: "No; if it was spent for the benefit of the trust, that would not be true, but it was his duty to complete the trust without spending the money in his effort to get these men together."

The effect of the charge was that, while defendant exceeded his rights in spending any portion of the money before the entire fund had been raised, if the expenditures were proper and beneficial to the syndicate, they would not be fraudulent.

The charge was based in part on representations contained in a circular sent out over defendant's signature under date of October 2, 1922. This circular contained the following statement:

"Confirming my public announcement of some days ago, this letter is written to advise you that the remaining unsold units of Gordon Campbell-Kevin Syndicate No. 2 have been underwritten by an Eastern banking investment concern, and that all my future financing will be done through the Fidelity Finance Company, whose offices are located in the Stanton Bank building at Great Falls, Mont. The advantages of this arrangement are obvious—it insures adequate money for my drilling operations, a quick increase in the value of outstanding units and spells an immediate profit for my pioneer unitholders."

The court did not err in charging that these representations meant that some one had agreed to take and pay for all the shares that had not yet been sold. The declaration of trust executed by defendant March 15, 1922, and placed of record in Toole county, Mont., named $250,000 as the capital stock of the syndicate. There was nothing stated therein or in the literature sent out to the effect that the money of the syndicate would be kept intact until the entire capital had been raised. The syndicate was not organized for the purchase of a piece of property at a fixed price, nor was the amount required for its operations otherwise definitely fixed. The declaration of trust vested the defendant as trustee with control of the moneys of the syndicate. In such case we think it cannot be said that the expenditure of money for the purposes of the trust is wrongful if made before the entire capital is raised. The mention of $250,000 as the capital of the syndicate was merely an assurance to the shareholders that the profits would be divided among parties whose entire holdings would not exceed that sum.

[7] It does not follow that the charge excepted to is substantial error. Since the act of February 26, 1919, 40 Stat. 1181 (Comp. St. Ann. Supp. 1923, § 1246), the burden devolves on a plaintiff in error to show that an inaccuracy in an instruction has deprived him of a substantial right. Haywood v. U. S. (C. C. A.) 268 F. 795, 798; Simpson v. U. S. (C. C. A.) 289 F. 188, 191. A transcript prepared from defendant's books showed that approximately half the amount realized from the sales of shares had been expended in the payment of commissions and expenses of the share-selling campaign. This we have seen was a fraudulent expenditure of the trust funds. Of the remaining money more than half was used by Gordon Campbell Petroleum Company and Gordon Campbell-Kevin Syndicate No. 1, other enterprises in which defendant was interested. This also was a fraudulent conversion of the trust funds. Worms v. Lake, 208 App. Div. 606, 203 N. Y. S. 659. The government's evidence of the use made of the trust funds is not controverted. The clear uncontroverted testimony showing that the syndicate moneys were improperly expended, it cannot be said that defendant suffered substantial injury by an instruction which gave an incorrect reason for holding the expenditure improper.

The scheme controlled by defendant was clearly fraudulent; it contemplated the use of the mails, and the mails were largely used in effecting it. These conclusions are inevitable from the uncontroverted testimony. The case falls within the rule announced in Horning v. District of Columbia, 254 U. S. 135, 41 S. Ct. 53, 65 L. Ed. 185.

There are two other exceptions to the charge which are not assigned as error or discussed in defendant's brief. There are a number of criticisms of the charge discussed in the brief which are not supported by exceptions. When the proof of guilt is so overwhelming as in this case, it is not our duty to seek out and determine questions not reserved in the trial court, and not presented by the record.

The judgment is affirmed.

RUDKIN, Circuit Judge. I dissent. The charge to the jury was largely argumentative in form and favored the government throughout. Inferences of fact were placed on the same footing as inferences of law, and no distinction whatever was made between implied fraud and actual fraud. In the end the verdict was made to turn upon the abstract legal right of the accused to pay commissions on sales of shares out of the proceeds of such sales, regardless of his belief or good faith in the premises. Indeed, no attempt was made on the oral argument to uphold the charge of the court, but the government pleaded for affirmance on the sole ground that the proof of guilt was so overwhelming that errors committed during the progress of the trial were not prejudicial. With such a contention I am unable to agree. A fair and impartial

trial by jury is the constitutional right of every person accused of crime, whether guilty or innocent, and that constitutional guaranty is not satisfied by a partisan, one-sided charge to the jury.

To show that my characterization of the charge is not overdrawn, I quote therefrom as follows:

"Now, furthermore, the object of this syndicate and joint adventure—I can make it more simple to you—you are not to be confused by words or talk of stock, joint adventure or trust estate. But, while you, gentlemen, were secluded for the past few days, let us suppose that one of you had proposed to the others, that, 'if each of you will give $1,000 apiece, I will go out and buy sheep and run them; you are not to ask or know anything about it, but, when there are any profits, I will distribute them around amongst you.' That would be just the kind of joint adventure or syndicate as is involved in this case, and that joint adventure would be all right providing he made no false representations to you, and dealt faithfully with you, though in such case there is a large opening for a dishonest man to work dishonestly if he wanted to. But, gentlemen of the jury, that simple case is exactly, in every respect, from the standpoint of law, common sense, and the facts, as the case that you have before you today.

"Now, here is another obligation on the part of this manager of the joint adventure: He is not entitled under the law, to appropriate one cent of that money to his own uses or for any purposes, until he has gotten into that enterprise all those that every one expects to come in. For instance, in this case, he advertised $250,000 capital, 2,500 so-called units, at $10—25,000 units, at $10. He was not entitled to take that money and spend it for the purpose of inducing others to come in. He had no right to pay $1 in commissions to Bloomhuff, or for advertising, to pay for expenses, or to mail out letters, or anything of that sort, because a promoter or a manager, the same as in a corporation, who undertakes to get together joint adventurers, if that sort, to that extent is in the nature of a trustee who must deal honestly with the others. And it is his duty to bring the parties and money together at his own expense, if he wants to promote it. He cannot spend it getting it together. Why, if he can spend half, he could spend all, and, the thing would be broke the moment he has got in the 25,000 investors, from the 25,000 units. So by that you can see that the law is only common sense. So, in this case, when this money was taken out to

pay Bloomhuff and taken out to pay the advertising, mailing, and expenses of this sort, that was a misappropriation. That was never made known to the joint adventurers. They were told, to all intents and purposes by this advertising, that, when all the units were sold, there would be a capital of $250,000 to operate with. There was nothing of the sort. Now, you ask yourselves whether that was not intended from the very beginning, whether that was not the very foundation from the beginning. The arrangement between the defendant and Bloomhuff was to have 50 per cent. for commissions and expenses for getting the people in.

"Another thing to be remembered is the defendant knows the method. One who promotes an enterprise of this sort to-day knows that it will be done by advertising and through the mails. You will presume that he had that knowledge. Every man of sense knows that. The court takes judicial notice of that fact, that those things are done by advertising and mailing; you don't sell shares in ventures by personal solicitation. Advertising and mailing are commonly done, are the constant practice, so it is to be inferred that the defendant knew it. That is not enough, however, of course, to make him guilty; that is, so far as it was to be done by advertising and by mailing, if it was done honestly. So, right there, gentlemen of the jury, if you find it was the intent of the defendant in selling these interests, in inviting these people to come in and join him, to use a large part of their money to advertise and to pay commissions to Bloomhuff and Dailey to induce them to come in, that was an injury to those who bought units, was a fraud against them, and was intended from the beginning, that, in connection with the rest of the government's case, is enough to warrant you to find the defendant guilty accordingly. As I say, the law forbids that it shall be done. You cannot use the investors' money to bring in other investors. He undertakes to do that when he sets it on foot, at his own expense. As I said before, you can readily see why. The law will not permit it. He must not touch that fund at all for any purpose until it is gathered together and then is to be used to buy properties, and to operate.

"Another fact in the case that you will consider, in connection with the question of whether there was an intent, scheme, or artifice to defraud, is that it was advertised that, after a certain amount had been sold, the rest of the units, as they call it—and mind, while we use that term, or stock, it is just the same sort of a case or enterprise that you might

have organized while in seclusion, as I have already told you—it was generally advertised that the balance was underwritten, and that held out to the public, to every one who had read it, that they were sure to have the $250,000 capital. In other words, you would not contribute $10 for a unit and another man contribute $10 for a unit, if he did not feel some assurance that finally the full amount would be gotten together to buy property and operate. So when, of course, it was advertised to the world that all outstanding and not yet sold was underwritten, that meant to them that some one had agreed to take and pay for all that had not yet been sold, and it was an assurance that this full amount, $250,000 would be in the treasury, and that the project would then proceed under the care and management of the defendant.

"Of course, that was not true. There is no denial that that was not true. There was no Eastern concern in the case. All there was was Bloomhuff, Dailey, and Wertheimer, who were partners and had a contract of agency to sell as much as they could at $10 a share, they to keep $5 and turn $5 into the treasury. So, in any event, there was no possibility of there ever being more than $125,000 in the treasury, while the enterprise held out to the world that there would be $250,000 when all the joint adventurers would get together and proceed to do business.

"So, gentlemen of the jury, that really is practically all of the case from that standpoint. Now, the defendant admits all of this, and his counsel seeks to justify it. So far as paying out a portion to Bloomhuff for expenses, etc., as I said, that is against the law. But, beyond that, the defense is not denying that the advertisements were sent out. The defendant said he knew nothing about it and was not responsible. There is a disputed question of fact, though perhaps not a material and vital one from the view of the law taken in the case, as I have already presented it to you. He will not be heard to deny that he did not know that whatever was sent out would be mailed, because every one knows that was commonly being done. Whether he can successfully deny that he knew anything of the nature of the advertising, is for you. But the fact remains that, if there was this understanding in the beginning, as there was, that a certain amount, a large part, half of this money, would be taken out and spent to get the adventurers together, he knew that, of course, because he had agreed to that. And, since the titles were not what were advertised, only half interest in tracts, he knew that, and that was not advertised. Now, did he

know the advertising? That is one of the questions for you to decide also. Bloomhuff says he does. It was a campaign carried on for months. Advertising appeared in numbers of your prominent, leading daily papers. Letters not delivered returned to his office in Kevin, at least, and Bloomhuff says they were sent out from there. And do you believe it reasonable, gentlemen of the jury? Do you believe that, as a common sense proposition that is entitled to credit, that advertising could continue to be sent out as long as it was and he not know of it, clear from the beginning? Ah, yes; there was another person—who was it—testified that he kept a scrapbook of it for the defendant, as it came out. The defendant says he did not know the nature of the advertising. He did testify, however, that, in respect to the fac simile of his signature on the letters, he knew that when the letters came back to Kevin; but five minutes later he testified that he did not know any letters returned to Kevin until it was disclosed here in court on yesterday. Now, why that great discrepancy then and there I do not assume to know, but you can take that into consideration in connection with the whole case.

"But if the original plan, as he admits, was that Bloomhuff was to take half of this money for selling the stock, and he paid for the advertising and the like out of it, he knowing that the mails would be used to send out invitations, even though they themselves have been fair, that would have been a scheme or artifice to defraud, misappropriation of the funds, and the mails used, as he must have known, to further it he would be guilty of the charge for that reason alone.

"Well, gentlemen of the jury, that is the case for you. Men cannot carry on enterprises of this sort at the expense of the investing public on misrepresentations, and with the intent to misappropriate money. That is what the law forbids. It cannot be done through and by way of the mails and when it is done through and by way of the mails, he who does it intentionally, knowingly, as I have read the law from the Supreme Court to you, is guilty of the intent or artifice to defraud, and using the mails to execute it, as charged in the indictment.

"I do not believe there is anything further that the court needs to say to you. The case is not at all an involved or difficult one, if you will just remember the simple illustration of the nature of the project which I have stated to you, and the obligations of the promoter of it, as I have stated them to you, by reason of the law. The law demands that he conserve the funds and keep them all togeth-

er, and not spend them for the purpose of paying expenses for getting it together."

The judgment should be reversed.