**UNITED STATES v. FOX et al.**

No. 313.

Circuit Court of Appeals, Second Circuit.

June 20, 1938.

Samuel Segal, of New York City, for appellants.

Vine H. Smith, of Brooklyn, N. Y., for the United States.

Before L. HAND, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

L. HAND, Circuit Judge.

This is an appeal from a judgment of conviction for robbery of the messenger of a national bank while in performance of his duty. The chief point raised is whether there was enough evidence to support a verdict, and this is limited to the identification of the two accused as the robbers. A subsidiary point is the limitation of the defendants' cross-examination. The undisputed facts were as follows. At about 10 o'clock on the morning of June 19th, 1936, Francis Gray, a messenger employed by the Farmingdale National Bank of Farmingdale, L. I., received on its behalf from the post office of that village $12,500 in currency. While walking south on the west side of Main Street in that village towards the bank building, he was struck down from behind, pushed into a motor car standing along the curb, robbed while half conscious and thrown out in the outskirts of the village. Nobody questions that whoever took part in this robbery was guilty under the three counts of the indictment here in question. Main Street runs from the railroad south to Conklin Street, at the corner of which the bank stands; a little more than half

way down, a lane runs off to the east. A motor car stood at the west curb of Main. Street, facing south about 60' north of this lane. As Gray approached this spot he noticed a man, whom he later identified as Fox, standing with his back to the street, who, as he approached, walked towards him on the inside and edged him towards the curb; it was just as the two were passing that Gray was struck down. The driver of the car, Benintende, a co-defendant, pleaded guilty, but did not take the stand; he was identified as the driver by several people, and we do not understand that his connection with the robbery is disputed. As soon as Gray had been pushed into the back seat, the car started down Main Street, turned to the left through the lane for a distance of about 250', then to the right into Conklin Street and so out of the village.

Of the foregoing facts all are admitted except Gray's conclusion that the man whom he identified as Fox edged him towards the curb. The other evidence against Fox was as follows. A witness, Polak, was walking west through the lane and had nearly reached its corner with Main Street when the car passed him so close that he had to flatten himself against a building on the north side to escape being run over. As it passed he saw a man in the back seat, whom he identified as Fox, looking down toward the floor in a posture proper to one who was holding down another at the point of a revolver. Gray swore that he was so held by one of the robbers. On the next day, the 20th, Fox and Benintende together bought a new motor car in Manhattan for $812.50 paid in cash: on the 25th, six days after the robbery Fox bought a suit of clothes in the Bronx: on the 30th another suit in the same place in company with Miller who also bought one. After his arrest Fox explained this sudden access of means by saying that he had been playing policy: he had been on relief before the robbery.

The evidence against Miller was this. One, Lammers, was a druggist whose shop was on the west side of Main Street, about 150' north of the place of the robbery. At some time during the half hour before it happened, he was standing at the door of his shop looking into the street. Two motor cars were standing side by side, just north of him, and his attention was directed to a third car which had to pass around both, and which seemed to him to be doing so at a dangerous speed. In the front seat of this car were three men—the one in the center, leaning forward, he identified as Miller. The identity of this car Lammers fixed because he noticed that it had a cardboard license plate bearing the letter "Q". The robbers' car was afterwards found ditched outside the village; it had been stolen and when found it bore a forward license plate of cardboard with that letter on it. Another witness, Hunt, after the hold-up, and knowing there had been one, saw the car turn down the lane and noticed at the time the rear license plate had a letter "Q". Two days earlier Miller and Benintende had gone to a gasoline station a short distance from the place of the hold-up and inquired for motor goggles (Benintende wore dark glasses when he drove the car). On June 27th, Miller bought a second-hand car in the Bronx for $445 of which he paid down $75; and, as we have said, he was with Fox on the 30th when Fox bought his second suit of clothes and when he bought one himself. Miller had also been on relief, but explained his purchases by saying that his wife had recently received an inheritance. When he was arrested in Fox's apartment in the Bronx, he denied that he had seen him recently, and explained his presence by saying that their wives were friends. He denied any acquaintance with Benintende.

■ Nobody can doubt that the identification of Fox was for the jury. It is true that at first Gray failed to pick him out in the "line-up", and that it was only after Fox appeared in a sweater of the color worn by the man who edged him towards the curb that Gray identified him. That marred the certainty of his conclusion, but the jury had to say how much: Gray did pick him out, and he had had plenty of chance to see him on the day of the robbery. Polak's identification of Fox at the "line-up" was not subject to this uncertainty; and he had been close to the man in the car whose speed could not have been very great, as it had only just finished the turn into the lane. The corroboration was substantial: Fox's association with Benintende on the following day and the evidence of wealth quite inconsistent with his former poverty.

■ The case against Miller was not so clear: Lammers's identification was less convincing than Gray's and Polak's of

Fox. There can, however, be little doubt that he saw the robbers' car, for it is hardly possible that there should have been two on that street with a cardboard license plate bearing the letter "Q". There were three and probably only three robbers concerned; so that the question is of Fox's and Benintende's single companion. It is true that Hunt said there were four or five, but he was the only witness to do so positively. Yet if the case against Miller stood upon Lammers's identification alone, there might be too much doubt. It does not. His home was in New York, yet on the day before the robbery he was close to its scene in Benintende's company, inquiring for what may fairly be regarded as a disguise; and he later lied about his association with Fox. His explanation of his new wealth his wife could have confirmed and she alone; she was a competent witness, Funk v. United States, 290 U.S. 371, 54 S.Ct. 212, 78 L.Ed. 369, 93 A.L.R. 1136. The inference that she would not have confirmed him drawn from his failure to call her was much stronger than the contrary inference from the prosecution's failure; and his privilege against self-incrimination did not protect him against such an inference. Graves v. United States, 150 U.S. 118, 14 S.Ct. 40, 37 L.Ed. 1021 (semble); Scala v. United States, 7 Cir., 54 F.2d 608, 610; Jenkins v. United States, 4 Cir., 58 F.2d 556; Willmering v. United States, 5 Cir., 61 F.2d 1009; Wigmore § 2273. Rostello v. United States, 7 Cir., 36 F.2d 899, depended upon the fact that the balance of inference was not against the defendant. In the light of all this it was most probable that the third robber was Miller. True, doubt was possible, but the safety of the accused in every case in the end depends upon how far the jury is disposed to be sceptical or credulous; all we can decide is whether a fair man could have come to a firm conclusion. We think that here he could.

The error charged was that the defence was not allowed to ask of a police officer upon cross-examination the names of those who had viewed the accused at the "line-up" in the police station, and whether some had not then been unable to identify them. Those then present who were later called as witnesses, could have been cross-examined, and the error, if any, was in refusing to give the names of others whom the defendants might wish to call, or in refusing to let it appear that there were some who could not identify the accused. It is of course true that a person who was present at the scene and saw the robbers, and who thought them different persons from the accused, would have been a most important witness. But the mere failure of a witness to the robbery to identify the accused, would not in the least prove that the robber was not the accused; at most it would have gone to show how unreliable must have been the identification of those who did identify him. Such an inference, however, depended upon all the circumstances which affected that putative witness's observation, including the kind of observer he was. That was an issue which contributed too little to the main inquiry to be worth the possible confusion which it would have brought into the case. As a practical matter the judge was right in excluding it.

Judgment affirmed.