**BRADFORD et al. v. UNITED STATES.**

No. 9853.

Circuit Court of Appeals, Fifth Circuit.

July 9, 1942.

John R. Hunter and T. F. Hunter, both of Alexandria, La., for appellants.

Malcolm E. Lafargue, U. S. Atty., of Shreveport, La., for appellee.

Before FOSTER, SIBLEY, and HOLMES, Circuit Judges.

HOLMES, Circuit Judge.

The appellants were convicted on count one of an indictment in five counts charging them with the use of the mails to execute a scheme to defraud the City of Alexandria, Louisiana, its citizens, and taxpayers. They were acquitted on the other four counts, which merely charged separate mailings in execution of the same scheme.

There are thirteen assignments of error, none of which is deemed meritorius enough to warrant special mention except the contention that the evidence is not sufficient to support the verdict of guilty as to William T. Bradford. Since the appellants were tried together, and since there was only a single scheme, it is necessary for us to consider the entire charge against the two Bradfords, who were indicted jointly with Monte E. Hart.

The scheme, as alleged in count one, was to use the offices and political influence of the two Bradfords to sell motor buses to the City at exorbitant prices, so that, from the money fraudulently obtained, the schemers would get unearned profits and commissions. The fraud was successfully carried out by the use of the mails, and, from the ill-gotten gains, Ben Bradford received $900, and his cousin, Will Bradford, was paid $2,000. During the period of the alleged scheme Ben was Finance Commissioner of the City of Alexandria, and as such had complete supervision over the bus system that was owned and operated by the City. He was one of three members of the City Council. The other two members were V. V. Lamkin, Mayor, and N. B. Bringhurst, Commissioner of Streets and Parks.

Will Bradford was a member of the Louisiana Legislature from Rapides Parish, and Secretary-Treasurer of the Louisiana State Colony and Training School. He helped Ahrens, the auto dealer, put through the bus sale to the City for an agreed compensation of five per centum. Ahrens first met him at Alexandria, and later saw him "around the lobby of the Roosevelt Hotel in New Orleans." Ahrens testified that Will Bradford kept him posted on how things were going on in Alexandria, and "used his influence to help me sell the buses". Upon being asked what he meant by "influence," he said that Will Bradford was friendly with the Administration.

Monte E. Hart, the third alleged schemer, is the same person that was convicted of using the mails to defraud in the case of United States v. Hart, et al., No. 9272 on the docket of this court.[1] He was President of the Transit Bus Corporation, which sold the buses to the City through a local dealer. The only other business of this corporation was the sale of three buses to the Shreveport Railways Company. The entire business of the corporation was the sale of fifteen buses, twelve to the City of Alexandria and three to the Shreveport Railways Company. The twelve buses were bought for the City of Alexandria from Dunnam Motor Company, eight under one resolution of the Council authorizing the purchase, and four under another. There were two dealers who got a profit out of the transaction, although the Ford Company reserved the right to sell directly to municipalities. Each resolution recited that there was a public emergency requiring immediate purchase of the buses, but it is clear that there was no emergency. The invoices ran from the Ford Motor Company to the Transit Bus Company.

The City of Alexandria had a commission form of government, with a mayor and two commissioners. The Council generally followed the suggestions of each commissioner for his department. While Victor Ake was Commissioner of Finance & Utilities, the City Council passed a resolution advertising for bids for eight buses, which bids were received, tabulated, and rejected. All of the bids were submitted directly by the manufacturers except the Ford bid and one other. Commissioner Ake died in July, 1937, and Ben Bradford was appointed to succeed him. In September, 1937, while Ben Bradford was responsible for the bus department, the Council passed a resolution authorizing the Mayor to purchase eight motor buses from Dunnam Motor Company at a stated price. The purchase was made and the buses paid for from City funds, in spite of a recent resolution of the Council that, due to lack of funds resulting from the depression, it had been impossible for the City to buy new buses.

On May 16, 1938, the Mayor entered into a contract with the Dunnam Motor Company for the purchase of four additional buses. This purchase was made before the resolution authorizing the same was approved. No bid was asked for before the contract was negotiated with the Dunnam Motor Company; there was no discussion of this purchase in open session of the Council in 1938, except as to the resolu-

[1] Hart v. United States, 5 Cir., 112 F. 2d 128; Id., 311 U.S. 684, 61 S.Ct. 60, 85 L.Ed. 441. Hart was also a co-defendant in the case of United States v. Leon C. Weiss, No. 9735 on the docket of this court. Weiss v. United States, 5 Cir., 120 F.2d 472; Id., 5 Cir., 122 F. 2d 675. Hart committed suicide shortly before the trial of his co-defendant, Leon C. Weiss.

tion of May 3, 1938. On the trial in the court below, the evidence was sufficient to support a finding that the price paid was so grossly exorbitant as to enable appellants fraudulently to obtain from the City large sums of money for themselves. The evidence further showed the following:

About October 25, 1937, appellants caused the City of Alexandria to pay to the local dealer, Dunnam Motor Company, for said eight buses the sum of $36,532.32, from which it paid to the Transit Bus Corporation, by its check sent by mail, the sum of $34,429.02, from which the latter corporation paid the Ford Motor Corporation only $26,896.48. The check of Dunnam Motor Company for $34,429.02, payable to the Transit Bus Corporation, seems to have been bought by the National Equipment Company. The endorsement thereon, in green ink and in the same handwriting, is as follows: "Transit Bus Corp., F. H. Ahrens, Pay to the order National Equipment Co., Inc., For Deposit, National Equipment Co., Inc., M. E. Hart."

Said check of the Dunnam Motor Company represented money received by it from the City of Alexandria, less its profit or commission; and the mailing of this check was the gist of the offense under count one. The date of this mailing, which was between the first and second purchases of buses under the scheme to defraud, was before either of the appellants had received his illegal commission, and prior to the consummation in 1938 of the scheme to defraud. About July 5, 1938, the City paid Dunnam Motor Company $20,-544.80 for the other four buses, $17,534.70 of which was paid to Transit Bus Corporation, and only $13,769.80 of which was paid to Ford Motor Company.

■ The evidence that the City was grossly defrauded, and that Ben Bradford was a party to the scheme and profited by it, not only warranted the jury in so believing beyond all reasonable doubt, but to the exclusion of every reasonable hypothesis of innocence. The payment of $900 to a member of the City Council, in the circumstances alleged and proven, might have been a bribe, but this would not prevent it from also being part of a scheme to defraud the City, in the execution of which the mails were caused to be used. In Shushan v. United States, 5 Cir., 117 F.2d 110, 115, 133 A.L.R. 1040, this court said, in an opinion by Judge Sibley: "A scheme to get a pub-lic contract on more favorable terms than would likely be got otherwise by bribing a public official would not only be a plan to commit the crime of bribery, but would also be a scheme to defraud the public. The fact that the official who is bribed is only one of several and could not award the contract by himself does not change the character of the scheme where he is expected to have influence enough to secure the end in view. No trustee has more sacred duties than a public official and any scheme to obtain an advantage by corrupting such an one must in the federal law be considered a scheme to defraud. The essential immorality of an arrangement of that sort, or even the use of undue personal influence, is illustrated in Oscanyan v. Winchester Arms Co., 103 U.S. 261, 26 L. Ed. 539; Crocker v. United States, 240 U. S. 74, 36 S.Ct. 245, 60 L.Ed. 533; Crawford v. United States, 212 U.S. 183, 29 S. Ct. 260, 53 L.Ed. 465, 15 Ann.Cas. 392; United States v. Carter, 217 U.S. 286, 30 S. Ct. 515, 54 L.Ed. 769, 19 Ann.Cas. 594; Pan American Petroleum Co. v. United States, 273 U.S. 456, 500, 47 S.Ct. 416, 71 L.Ed. 734. We agree with appellants that the constructive frauds which equity in civil cases sometimes sets up to do justice will not suffice under this criminal statute; and that there must be a purpose to do wrong which is inconsistent with moral uprightness. So conceding, we think a scheme to defraud by corrupting an official and also by misrepresentation of results achieved is alleged."

In United States v. Buckner, 2 Cir., 108 F.2d 921, page 926, the court said: "Intentionally converting trust funds to the personal use of the trustees is a patent fraud on the cestuis from whom the funds were solicited. Campbell v. United States, 9 Cir., 12 F.2d 873. Using a fiduciary position as a protective committee member to obtain secret profits based upon inside information, is not only a breach of trust, but an active fraud on the bondholders." See, also, Hart v. United States, 5 Cir., 112 F.2d 128, Id., 311 U.S. 684, 61 S.Ct. 60, 85 L.Ed. 441.

■ That Commissioner Bradford knew all about the details of the scheme is further indicated by his statement to Harris, foreman of the Rapides Parish grand jury, that Mayor Lamkin himself had received $2,000 out of the fraudulent deal, and that some of the Mayor's kinfolks were down before the grand jury telling off on him.

We think the judgment against Ben Bradford should be affirmed, and deem it unnecessary to discuss the case further as to him; but we desire to say something more with reference to Will Bradford, whose guilt turns upon the question of scienter. A man may do many acts that are justified or not, depending upon whether he is ignorant or not of certain facts. If Will was duped, if he did not know he was assisting others to perpetrate a crime, and if there was no evidence to warrant the jury in finding that he did know, then the judgment should be reversed as to him. Let us consider this aspect of the case.

In affirming the sentence of Ben Bradford we are necessarily holding the corpus delicti of the charge against Will Bradford has been proven, because they are jointly indicted for the same crime. In so affirming, we are further holding that the crime committed by Ben was causing the mails to be used in executing a scheme to defraud the City of Alexandria in the purchase of eight Ford motor buses at exorbitant prices for the purpose of obtaining illegal profits. The evidence shows that this fraudulent scheme was participated in by representatives of the seller and purchaser respectively; that Will Bradford was employed to assist in executing the scheme because he was an influential man and was friendly with the Administration; that he kept Ahrens posted as to how things were going on in Alexandria; that he was paid for his services from the profits of the fraud; that the payment was made not by check but in cash; and that the payment took place not in Alexandria but in New Orleans. No part of the $900 received by Ben nor the $2,000 received by Will, nor even the federal-excise-tax refund of $1175.48, was ever paid back to the City of Alexandria.

These salient facts, standing out in the midst of many minor circumstances in evidence, were sufficient to require some contradictory or explanatory testimony (not necessarily by, but) in behalf of Will Bradford, or an inference of guilty knowledge reasonably could be drawn against him by the jury. The presumption of innocence is one of the strongest rebuttable presumptions known to the law, but it disappears when a verdict of guilty, supported by substantial evidence, is returned against the defendant.

One is ordinarily presumed to intend the natural and probable consequences of one's acts. If one consorts with criminals, accepts employment from them, aids and abets them in their plans and purposes, secretly receives from them a part of the money illegally obtained, and offers no evidence of the nature of the employment, of what was done to earn the money, or of any fact explanatory of such conduct—if all these things are true, an inference of one's guilty knowledge may fairly and reasonably be drawn therefrom by the jury. There was evidence to support a finding that the profit on this fraudulent deal was over twenty-seven per cent and that ten per cent would have been a fair profit. In these circumstances the jury had the right to draw the line between a fair profit and a fraudulently exorbitant one. A finding of guilty knowledge may be drawn from all the facts and circumstances in evidence. This is the only way scienter can be shown. In this case the circumstantial evidence of guilty knowledge was sufficient to exclude every reasonable hypothesis of the innocence of Will Bradford.

Where evidence of scienter has been given, it may be rebutted; as where the charge is passing counterfeit money, the defendant may show that under the circumstances he had reason to suppose it was genuine. In some jurisdictions the unexplained possession of recently stolen goods is sufficient to warrant an inference of guilt upon a charge of larceny [2] or even of burglary. [3] We have here the unexplained participation in the execution of a scheme to defraud, and the clandestine acceptance of part of the proceeds derived therefrom. In addition, there were other facts and circumstances in evidence, to some of which attention has been called, that were entitled to consideration by the jury in making a finding as to the guilt or innocence of this appellant.

In its last analysis, the contention of W. T. Bradford is reduced to this: that although he was employed and paid to aid in selling buses to the City, he did not know he was doing wrong, but was the innocent agent of guilty associates. This is hard to believe, and the jury did not believe it. If he did not help put through the deal and report progress thereon to Ahrens, there is no evidence in the record to show what he did to earn the money paid to him; nor is

[2] 25 Cyclopedia of Law & Procedure, p. 131, and authorities cited in note 91.

[3] 12 C.J.S., Burglary, § 45, pp. 716, 717, 718.

there any explanation why he made the long trip to New Orleans to receive the money in cash instead of completing the transaction by check as is customary among business men in payments of large sums. What was going on was the perpetration of a scheme to defraud, and the jury rejected the theory that this public official kept Ahrens posted as to what was going on in Alexandria and was ignorant of the fact that a crime was being committed. We should not substitute our judgment for the finding of the jury.

■■ The court below did not err in not charging the jury with reference to the failure of Will Bradford to take the witness stand in his own behalf. In support of their assignment that there was error in this respect, the appellants cite the case of State v. Johnson, 50 La.Ann. 138, 23 So. 199. This decision is not binding or even persuasive where there are federal statutes and decisions on the subject. Upon the trial below, W. T. Bradford did not testify or offer to testify, and did not request any charge on the subject of his failure to do so. In these circumstances, no doubt it was better for the court not to mention the matter. Otherwise we might have been confronted with assignments from a different angle, as in Becher v. United States, 2 Cir., 5 F.2d 45.

■ No presumption against the accused arose from his not testifying in his own behalf, but his failure to testify did not raise a presumption in his favor or enable him to avoid the consequences of fair and reasonable inferences from proven facts. [4]

We think the verdict of the jury was amply warranted by the evidence as to both of the appellants, and the judgments appealed from are affirmed.

SIBLEY, Circuit Judge (dissenting in part).

Ben Bradford was a city official who could influence, if he did not control, the purchase of the busses. He was paid money in connection with the sale. While the evidence is not strong against him, it justifies a verdict under the principles decided in the Shushan case, 117 F.2d 110, 133 A.L.R. 1040. I find no evidence at all that W. T. Bradford had any part in or knowledge of the corrupting of Ben Bradford. The evidence touching W. T. Bradford is hardly a score of lines in the record. Hart had a company in New Orleans for which Ahrens was salesman on a commission basis. Ahrens was very anxious to sell the busses which the City of Alexandria was about to buy. He joined forces with the local Ford agency at Alexandria, and being acquainted with W. T. Bradford as of some local weight and influence offered to pay him five percent for his assistance. Ahrens was expecting a profit in the sale of about twenty-five per cent, and nothing was added to the price put on the busses because of that offer to W. T. Bradford. Bradford did very little. Nothing definite is proven. He had no connection at all with the city administration. He was a cousin of Ben Bradford but not personally close to him, being of another faction politically. They had no contact about this deal at all. Nothing suspicious, much less criminal, is shown to have been done by W. T. Bradford. When the first sale was settled for, Ahrens paid him in cash what he had agreed to pay. Bradford had no part in the second sale and was paid nothing on account of that. Ahrens later paid Ben Bradford. The city officials testify W. T. Bradford made no approach to them about the sale. While he was paid a good deal for doing very little, I find no proof that he participated knowingly in any fraudulent scheme.

---

[4] See 22 C.J.S., Criminal Law, § 593, citing authorities, including one in note 53 where it was held that the failure of one charged with conspiracy to defraud to explain unusual possession of large amount of currency could be used against him. People v. Connelly, 253 N.Y. 330, 171 N.E. 393, affirming 227 App.Div. 167, 237 N.Y.S. 303, followed in People v. Seely, App.Div., 237 N.Y.S. 338. See, also, note 57, 22 C.J.S., Criminal Law, § 594, p. 911, citing authorities, that failure to introduce important testimony relating to facts peculiarly within his knowledge raises an inference or presumption that such testimony would have been unfavorable to accused. Cf. United States v. Fox, 2 Cir., 97 F.2d 913; also State v. Ford, 109 Conn. 490, 146 A. 828; State v. Hendley, 113 N.J.L. 335, 17 A. 572; also Wilson v. United States, 162 U.S. 613, 16 S.Ct. 895, 898, 40 L. Ed. 1090, wherein the court said: "Possession of the fruits of crime, recently after its commission, justifies the inference that the possession is guilty possession, and, though only prima facie evidence of guilt, may be of controlling weight, unless explained by the circumstances or accounted for in some way consistent with innocence."